Brandon Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

RECEIVED

MAR 22 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

March 13, 2023

Clerk's office
U.S. District Court
Northern District of Iowa
111 Seventh Avenue, SE 5th Floor
Cedar Rapids, Iowa 52401-2101

Re: Brandon James Seys v. United States,
19-CR-1004-JW
Motion to Vacate, Set Aside or Correct Sentence

Dear Clerk,

Please find the original and two copies of Motion under 2255. Would be kind enough and return a copy stamped filed verifying the documents have been filed. Thank you.

Sincerely

Brandon Seys

cc: file

AO 243 (Rev. 09/17)

RECEIVED

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

MAR 22 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

| **United States District Court** Northern | District of Iowa (Eastern Dubuque) | |
|---|---|---|
| Name *(under which you were convicted)*: <br> Brandon James Seys | | Docket or Case No.: <br> 19-CR-1004-JW |
| Place of Confinement: FCI Williamsburg | Prisoner No.: <br> 17827-029 | |
| UNITED STATES OF AMERICA <br> V. | Movant *(include name under which convicted)* <br> Brandon James Seys | |

**MOTION**

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:
    U.S. District Court Northern District of Iowa (Eastern Dubuque)

    (b) Criminal docket or case number (if you know): 19-CR-1004-JW

2.  (a) Date of the judgment of conviction (if you know): October 22, 2019
    (b) Date of sentencing: December 23, 2020

3.  Length of sentence: 324 months

4.  Nature of crime (all counts): Conspiracy to Distribute Methamphetamine in violation
    of 21 U.S.C. §841(a)(1), §841(b)(1)(A), and 846 (Count 1); Possession of a
    Firearm by a Felon in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2)
    (Count 3).

5.  (a) What was your plea? (Check one)
    (1) Not guilty ☐     (2) Guilty ☒     (3) Nolo contendere (no contest) ☐

6.  (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment,
    what did you plead guilty to and what did you plead not guilty to?     N/A

6.  If you went to trial, what kind of trial did you have? (Check one)     Jury ☐     Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ☐     No ☐

8. Did you appeal from the judgment of conviction?　　Yes ☒　　　No ☐

9. If you did appeal, answer the following:
   (a) Name of court:　 U.S. Court of Appeals Eighth Circuit
   (b) Docket or case number (if you know):　 No. 20-3720
   (c) Result:　 Affirmed
   (d) Date of result (if you know):　 March 1, 2022
   (e) Citation to the case (if you know):　 2022 U.S. App. LEXIS 5343
   (f) Grounds raised:　 (1) District Court erred by denying motion to withdraw guilty plea; (2) District Court erred by denying a reduction for acceptance of responsibility; and (3) District Court erred in imposing an unreasonable sentence.

   (g) Did you file a petition for certiorari in the United States Supreme Court?　　Yes ☐　　No ☒
       If "Yes," answer the following:
       (1) Docket or case number (if you know): _____
       (2) Result: _____
       (3) Date of result (if you know): _____
       (4) Citation to the case (if you know): _____
       (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
    Yes ☐　　No ☒

11. If your answer to Question 10 was "Yes," give the following information:
    (a) (1) Name of court: _____
        (2) Docket or case number (if you know): _____
        (3) Date of filing (if you know): _____

2

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

_____

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes [ ]        No [ ]

(7)  Result: _____

(8)  Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

_____

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes [ ]        No [ ]

(7)  Result: _____

(8)  Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:          Yes [ ]          No [ ]

(2)  Second petition:      Yes [ ]          No [ ]

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

3

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:**  Whether counsel rendered ineffective assistance of counsel at suppression hearing?

    (a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

    This case involves the use of a GPS tracking device on Mr. Seys' vehicles. On November 30, 2018, a County of Dubuque, Iowa, Judge issued a search warrant authorizing law enforcement to place a global positioning system (GPS) tracking device on a Silver 2005 Cadillac CTS, and a Silver 2005 Chrysler Town and Country Van, both of which Mr. Seys had a reasonable expectation of privacy.

    Placement of a GPS tracking device on a vehicle is a search within the meaning of the Fourth Amendment, requiring probable cause and a warrant. Probable cause exists when, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place or the requested search will lead to the discovery of evidence. This requires a nexus between the items officers are searching for and the place or item to be searched.

    During the suppression hearing counsel argued the November 30, 2018, GPS search warrant was based on an affidavit which was clearly lacking in sufficient indicia of

    (b) **Direct Appeal of Ground One:**

        (1) If you appealed from the judgment of conviction, did you raise this issue?

            Yes ☐    No ☒

        (2) If you did not raise this issue in your direct appeal, explain why:

        Issue wasn't available until Seys' appeals had concluded.

    (c) **Post-Conviction Proceedings:**

        (1) Did you raise this issue in any post-conviction motion, petition, or application?

            Yes ☐    No ☒

        (2) If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available):

        (3) Did you receive a hearing on your motion, petition, or application?

            Yes ☐    No ☐

GROUND ONE Supporting facts continues:

probable cause.  The information provided in the underlying affidavit it was stale, vague, misleading and wholly insufficient to provide the necessary probable cause to issue the GPS search warrant.

The affidavit submitted in support of the application for the GPS search warrant states:

During the end of 2017 or beginning of 2018, Inv. Chad Leitzen met with Michael John Selle while in the area of Stafford Street and Providence Street.  Selle advised Inv. Leitzen that he would like to provide information to the Dubuque Drug Task Force (DDTF) about a large-scale methamphetamine dealer in Dubuque.  Selle identified the subject as Brandon Seys.  He was fully identified as Brandon James Seys.

Selle stated that Seys regularly makes trips to Kansas City in order to pick up large amounts of methamphetamine.  He then transports the meth back to Dubuque to sell it.

Selle stated that he (Selle) recently broke up with his girlfriend, Kimberly Rene Stonehocker who was in jail in Dubuque County on the date Inv. Leitzen spoke to Selle. Selle stated that after he and Stonehocker broke up Stonehocker began dating Seys.  Selle stated that Stonehocker recently took a trip to Kansas City with Seys at which time Seys picked up methamphetamine and transported it back to Dubuque in order to sell it.

Selle was in possession of Stonehocker's phone at that time. He opened up Google Maps on her phone and accessed the history tab which showed a recent visit to a hotel in Kansas City.  Selle advised that Stonehocker had told him that is where they met Seys' methamphetamine supplier.  Selle advised that Inv. Leitzen could speak to Stonehocker and she would be willing to provide him with information on Seys as well.

A short time after speaking with Selle, Inv. Leitzen did meet with Stonehocker at the Dubuque County Jail.  Inv. Leitzen asked her to tell him about Brandon Seys. Stonehocker stated that she had recently dated him for a short time and while they were dating, Stonehocker took a trip with Seys to Kansas City.  She stated that she thought they were going to Kansas City to visit some of Seys' family, but instead they went to a hotel and met with a methamphetamine supplier.  Stonehocker stated that Seys acquired some methamphetamine from the supplier and they returned to Dubuque so Seys could sell the meth.  Stonehocker stated that she could not remember exactly where the hotel was, but if Inv. Leitzen were to talk to Mike Selle, Selle would show him the Google Maps history in her phone.  She stated that the hotel location was saved in her phone.  Stonehocker was unsure how much methamphetamine Seys had acquired from his supplier.

On April 30, 2018, Inv. Leitzen met with Selle while he was incarcerated at the Dubuque County Jail.  Selle advised that he would, again, like to provide information to the DDTF.  Selle stated that there were several subjects in Dubuque who he could purchase methamphetamine from, but one of the biggest suppliers of methamphetamine in Dubuque that he knew of was still Brandon Seys. Selle stated that it would normal for him to purchase 1/2 pound of ICE methamphetamine from Seys at a time.

GROUND ONE Supporting facts continues:

On May 26, 2018, the Muscatine County Sheriff's Office investigated a motor vehicle accident in the city of Muscatine. A motor vehicle had crashed into unoccupied parked vehicle. The occupants did leave the scene. Two backpacks were located near the scene of the crash. Inside the bookbags, a total of 8.5 ounces of methamphetamine was located. Also located in the backpacks were spiral notebooks that contained the name of Brandon Seys.

On Tuesday, October 16, 2018, Inv. Leitzen spoke to Daniel Gene Findley after he was arrested for being in possession of approximately 11 grams of ICE methamphetamine. Findley stated that he had gotten that methamphetamine from Brandon Seys the night before and owes Seys $400 for it.

Findley stated that Seys was the biggest methamphetamine dealer in Dubuque at that time. He stated that Seys drives a silver minivan or silver car, but he did not know the license plates on either vehicle.

Findley stated that Seys is dating a female subject named Liz Davey. She was fully identified as Elizabeth Kay Davey. Findley stated that Seys is living with Davey, and he did not know where their house was.

Findley provided a phone number of 563-587-9832 for Seys and also showed Inv. Leitzen the text messages and call logs between himself and Seys. The text messages were vague, but Findley stated that is was coded drug talk with Seys.

Findley stated that Seys get multiple pounds of ICE mehtamphetamine from an unknown subject in Kansas City. He stated that Seys makes trips to Kansas City every week or two in order to pick up methamphetamine and bring it back to Dubuque to sell.

Findley also advised that Seys own several guns and always has one in his possession. According to Findley, Seys has stated that he will shoot it out with police if they ever came to arrest him. Findley stated that Seys is very paranoid and he fully believes Seys will do that.

On October 10th, I, Investigator Kearney, did meet with Dubuque County Jail inmate Cimaron Mann who wanted to provide drug information on Brandon Seys. Mann stated that he used to purchase large amounts of methamphetamine from Seys prior to being incarcerated. Mann said that Seys is bringing in 5 to 10 kilos of methamphetamine into the Dubuque area on a consistent basis. Mann said that Seys does travel to different cities to bring back methamphetamine which include Davenport and Cedar Rapids. Mann said that Seys does operate a silver colored van. Seys also is in possession of a .40 caliber handgun and carries around large amounts of US currency which exceeds $100,000 dollars. Mann also said that Seys' girlfriend is Elizabeth Davey.

On October 29, 2018, I did speak to CI #12117 who wanted to provide information on a subject involved with selling a large amount of methamphetamine. CI #12117 stated that they observed Kim Hentges selling methamphetamine this summer into early fall. CI #12117 said that Hentges source was a white male in his 40's that drove a silver colored van. CI #12117 said that they heard Hentges and this white male talk about pounds of methamphetamine getting transported to Dubuque. Through a photo lineup, CI #12117 did positively identify the subject driving the silver van as Brandon Seys.

GROUND ONE Supporting facts continues:

On October 26, 2018 Investigators observed a silver Cadillac parked at 740 Boyer Street in Dubuque, the residence where investigators believed Seys was residing at that time. The aforementioned Cadillac bore Iowa registration plate "HLE743," which was registered to James Kringle of 3075 Oak Crest Drive, Dubuque, Iowa. Officers observed that while the Cadillac was parked at 740 Boyer Street, two other vehicles which were both registered to Seys were parked there also. Those vehicles included a silver Chrysler Town and Country Van (bearing Iowa registration plate "GZL536") and a silver Chevrolet Monte Carlo (bearing Iowa registration plate "GZL108"). Officers subsequently observed the Cadillac at the residence on Boyer Street (along with the two vehicles registered to Seys) on multiple occasions.

On Monday October 29, 2018 Special Agent Josha Mulnix, of the Division of Narcotics Enforcement, spoke with Special Agent Jarrett Harvey, of the Division of Criminal Investigation, at the Rhythm City Casino in Davenport, Iowa. At that time, Special Agent Harvey talked to Special Agent Mulnix about recent occasions when Seys and Elizabeth Davey had spent time at the Rhythm City Casino, Special Agent Mulnix and Investigators with the Dubque Drug Task Force coordinated with Special Agent Harvey to submit subpoenas to the Rhythm City Casino for casino surveillance video recordings, as well as casino database information pertaining to Seys and Davey.

Rhythm City casino surveillance records and date documented that Seys and Davey were at the Rhythm City Casino on October 13, 2018. Special Agent Mulnix and Investigator Slight reviewed surveillance video, with the assistance of Special Agent Harvey, and confirmed Davey's appearance in the surveillance video was consistent with other photographs of her they had previously observed. They also reviewed surveillance video and confirmed Seys' appearance in surveillance video was consistent with other photographs of him they had previously observed of him.

After reviewing the October 13, 2018 surveillance footage from Rhythm City Casino, it appears Brandon Seys, Elizabeth Davey and a unidentified white male (hereinafter "UMI")) enter the casino together. Surveillance footage does how "UMI" count out cash and set it near the slot machine where Davey was seated. Davey then reached into her pursue and hands "UMI" a bag containing a white colored substance. Surveillance footage then shows Seys, Davey and "UMI" inside a silver Cadillac that appeared to have a temporary rear plate. The Cadillac then drove from the parking lot with Seys in the driver's seat.

Through subpoenaed casino records, Brandon Seys and Elizabeth Davey did gamble at Isle of Capri in Bethendorf Iowa on October 24 and 25 and during that time Seys played over $12,000 dollars worth of chips at the casino.

On October 30, 2018, Investigators from the Dubuque Drug Task Force observed a silver Cadillac bearing Iowa plate HLE743 parked at the "Q Casino." Investigators did observe Brandon Seys inside the casino playing at the table games. Investigators then observed Seys leave the casino in the aforementioned Cadillac. The silver Cadillac was later observed parked at 740 Boyer Street in Dubuque, Iowa. This address is known to be occupied by Kim Hentges.

On November 6, 2018, I did again speak to Dubuque County Jail inmate Cimaron Mann. Mann said that Seys is staying at Kim Hentges residence in Dubuque which

GROUND ONE Supporting facts continues:

is considered his safe house. Mann said that he (Mann) has seen Kim Hentges on multiple occasions. Mann also said that he gave Brandon Seys a "TEC 9" handgun before Mann went to jail.

On November 19, 2018, Investigators met with Dubuque County Jail inmate Robbie Hess on the jail floor. Hess stated that the main supplier methamphetamine in Duduque was Brandon Seys. Hess has been Seys in possession of multiple pounds of methamphetamine. Hess stated that Seys drive silver van and a light-colored Cadillac. Hess said that Seys has multiple suppliers for methamphetamine that is in different cities including Kansas City, Cedar Rapids and Joliet Illinois. Hess also states that methamphetamine is brought to Seys from a subject that live in Minnesota.

Based on this information, the officer applied for a search warrant authorizing law enforcement to place a global positioning system tracking device on Seys silver 2005 Cadillac CTS and a silver 2005 Chrysler Town and Country Van.

Counsel sought to suppress all physical evidence seized during these searches, and dismissal of the case. Counsel believed if the evidence seized because of the GPS tracking of Seys' vehicles could not be used, Seys could not be prosecuted.

The GPS devices were installed and used to monitor the movement of the vehicles for approximately three weeks and thereafter led to the issuance of additional search warrants for Seys' residence in Dubuque, Iowa, a hotel room at a casino, the same vehicle, that had the GPS units attached, a storage unit, and his person. But nothing in the affidavit attached to the warrant established that Seys' cars had been or was likely to be used in trafficking activities.

Counsel's failure to argue at the suppression hearing that the GPS installed on Seys' vehicles violated his rights where there was nothing in the affidavit attached to the warrant established that Seys silver 2005 Cadillac CTS and silver 2005 Chrysler Town and Country Van both of which Seys had a reasonable expectation of privacy, had been or were likely to be used in trafficking activities.

Had counsel argued the GPS installed on Seys' silver 2005 Cadillac CTS and silver 2005 Chrysler Town and Country Van violated his rights where there was nothing in the affidavit attached to the warrant established that Seys' cars had been or was likely to be used in trafficking activities the outcome of the proceeding would have been different. Because information obtained as a result of the GPS tracking device installed on defendant's vehicle was gathered in violation of defendant's rights were there was nothing in the affidavit attached to the warrant that established that defendant's car had been or was likely to be used in trafficking activities.

The use of the GPS was a violation of Seys' Fourth Amendment rights and had counsel properly argued the violation at the suppression hearing a motion to suppress would have been granted. The evidence obtained in violation of Seys' Fourth Amendment rights must be excluded.

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

GROUND TWO: <u>Whether counsel rendered constitutionally ineffective assistance at</u> <u>withdrawal of guilty plea hearing?</u>

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

In late 2017 or early 2018 law enforcement began to investigate Brandon Seys for alleged involvement in the distribution of methamphetamine in the Dubuque, Iowa area. The investigation culminated on December 30, 2018, when law enforcement executed search warrants for Seys' person, a hotel room where he had been staying that evening, his vehicle, a storage unit, and his residence in Dubuque. Seys was taken into custody at the hotel and found to be in possession of $10,792 in cash. Inside the hotel room, law enforcement recovered 95.14 grams of cocaine and 183.39 grams of methamphetamine. In Seys' vehicle parked outside the hotel, law enforcement found several glass pipes, drug packaging material, and a digital scale. At the storage unit law enforcement found two handguns. At Seys' residence, law enforcement located one round of ammunition.

A hearing was held on Seys' motion to withdraw guilty plea on June 12, 2018. This case involved an alleged conspiracy to distribute methamphetamine and cocaine.
✻✻✻ continues on preceding pages ✻✻✻

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

GROUND TWO Supporting facts continues:

On November 30, 2018, the Dubuque Drug Task Force ("DDTF") commenced a 24 hour video surveillance using a Milestone Surveillance Camera on 740 Boyer Street, Dubuque, Iowa, a home associated with Seys as well as placed GPS monitoring devices on two automobiles he owned. The Milestone camera belonged to the State of Iowa. The State Division of Narcotics Enforcement ("DNE") and Agent Joshua Mulnix, who was also involved in the case, in their completed request from for the camera, DNE submitted a form which provided, "Note IP video will be maintained for no more than 30 days unless specifically requested." This Milestone camera remained in place until mid-January 2019. Seys was arrested on State charges on December 30, 2018 and has been in State or Federal custody since then. It was not clear at that time whether the camera was installed with an approved search warrant, but realistically, if the camera was in a public place, it was legal.

In Seys' motion to dismiss, which was based on alleged due process violations from law enforcement's failure to preserve footage from the Milestone camera Seys appeared and pleaded guilty to Counts 1 and 3 of the superseding indictment. On January 27, 2020, Seys' then attorney Michael Lahammer served a subpoena on SA Craig Mackaman. The subpoena requested "disclosure and presentation of copies of any video or other media that showed the residence at 740 Boyer Street within the time frames of November 20, 2018 to January 15, 2019."

SA Mackaman sent 72 two-hour video clips from 18 different days of video surveillance to Seys' counsel in response to the subpoena. SA Mackaman stated that he did look on the State server "Archive Folder" and found small clips of the Milestone video he believed was on December 30, 2018. SA Mackaman stated that sometimes the server will save small clips of video recordings on its own. SA Milestone also said that the clips are scattered over a couple weeks time period. Inv. Kearney told SA Mackaman that he asked DCI Agent Witt back in May of 2019 if there were any Boyer Street videos on the server and she stated that she didn't see any. SA Mackaman said that the clips were only found in the Archive Folder.

In May, 2019 at the request of AUSA Emily Nydle, Inv. Kearney asked SA Holly Witt if there was any video remaining from the camera. Inv. Kearney did not expect there to be any video because he understood that video was not preserved if hard drives were not provided at the beginning of the recording process.

Inv. Kearney made representations in his search warrant application stating that video from the Milestone camera and physical surveillance showed certain things occurred at 740 Boyer Street. He stated if this case went to trial he would testify that certain persons known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street and Seys would frequently have black bags and/or brief cases in his possession when he left the house which was something he had observed on the Milestone video. To Inv. Kearney's knowledge none of the video that was lost included any inculpatory or exculpatory information. This is only what he testified to.

Inv. Kearney's supplemental report indicates, "I asked Agent Witt back in May 2019 if there were any Boyer Street video on the server and she stated she didn't see any." If Inv. Kearney actually believed that the Milestone camera video would be saved for 30 days, and if he truly wanted to preserve the video, his failure to contact the State to preserve the video within 30 days shows he did not want to preserve it and purposely acted in bad faith to allow it to be destroyed.

10

GROUND TWO Supporting facts continues:

The Government responded Seys' plea was entered knowingly and voluntarily after adequate representation by counsel as demonstrated by his colloquy with the Court during his plea hearing. The Government further argued the new evidence did not support a finding that Inv. Kearney knowingly failed to preserve evidence, provided false testimony in August 2019, or that any evidence supposedly suppressed by the Government was both favorable to Seys and material to issue of guilt.

The Court opined a defendant has no absolute right to withdraw a guilty plea. The Court held a district court may, however, allow a defendant to withdraw his guilty plea if he shows a "fair and just reasons," Fed. R. Crim. P. 11(d)(2)(B).

Seys argues counsel was ineffective because a fair and just reason had already existed. The Court saw no fair and just reason to question Seys regarding the voluntariness of his decision to plea guilty, and found Seys failed to argue there were deficiencies with his plea at the time it was made which collaterally estopped him from making the argument because it was not preserved for review. The Court opined Seys entered his plea knowingly and voluntarily after adequate representation by counsel.

Inv. Kearney's own statement that he "asked DCI Agent Witt back in May 2019 if there were any Boyer Street video on the server and she stated she didn't see any," and Ms. Nydle sent Mr. Lahammer an email at 1:15 p.m., that stated, "I checked with the agents regarding the cameras - they stated the camera server for the Boyer Street camera was not saved on the State server" and "there was nothing really to observe on the camera other than Seys coming and going from there which is proved through the GPS reports and officer surveillance. He further stated, "We did submit camera still shots of him carrying his black bags from the Cadillac," but that didn't prove culpability. The footage would have been useful exposing additional false claims made by Inv. Kearney.

The Court stated that it was the Government's duty to preserve evidence, but that it was "limited to evidence that might be expected to play a significant role in the suspect's defense." To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

The problem here is that the defense couldn't place a specific fact that when the Government didn't provide the alleged footage evidence, but had Seys had it it could have changed the outcome of the proceeding.

To establish a Brady violation, Seys had to show the Government "suppressed evidence that was both favorable to the defense and material to the issue of guilt or punishment. Evidence is "material" if there is a "reasonable probability" that, had it been disclosed, "the result of the proceeding would have been different." Under Brady a criminal defendant must prove bad faith on the part of the police to make out a due process violation.

The burden is on the defendant to demonstrate the evidence was destroyed in bad faith, but Seys contends that was the problem, there was no evidence to prove these facts. However, intentional destruction of evidence is sufficient. The loss of video footage left Seys without a way to refute Inv. Kearney's statements in

11

the search warrant affidavit, which were based on video surveillance of 740 Boyer Street. Seys contends Inv. Kearney's conduct was "an affront to justice," that requires he be allowed to withdraw his guilty plea. The Court held that Seys had not prove the video footage would have been exculpatory. Seys contends the evidence certainly would have been able to show that certain people did not frequent 740 Boyer Street. The video would have also been a powerful additional impeachment of the Government's lead investigator, Inv. Kearney, who if had trial counsel performed effective would have found out that. The Court's position was that Seys speculated as to the materiality of what was on the video. This was the problem because that was not enough to support a Brady claim.

The Court falsely held that there was no evidence that when the video began self-deleting, anyone was aware of what was being deleted and what was being preserved. No where was there evidence that the camera even self delete as was proffered.

SA Mackaman testified that "the server... with the software... once a video file reaches the date of the retention, it starts to delete... the longest held file. No one brought certified documents of that statement. So at day 46... the video that would have been there day 1 should be... removed... its kind of rolling time frame. It is very plausible that SA Mackaman was protecting Inv. Kearney. Judge Roberts stated in "my report and recommendation recommending the district court deny Seys' pretrial motions and in Judge Williams' order denying the same, we both relied, in part, on Seys' ability to obtain evidence about activity outside 740 Boyer Street from his own surveillance system that was seized by law enforcement, which "significantly undercut his argument that he could not obtain comparable evidence by other reasonable means." Basically, the Judge stated Seys did not bring forth sufficient evidence to make the case. If the surveillance video was inaccessible to Defendant, he should have presented this argument, and any supporting testimony, earlier. The Court believed Seys was too late to proffer the arguments he did. Likewise, Seys asserted that Inv. Kearney made false statements in search warrant affidavit and at his detention hearing. The report said, "[C.M.] says that he may or may not have sold/given Seys a TEC 9 gun right before he was arrested." "May" or "May Not" is not sufficient evidence to hold against Seys in the first place. In the search warrant affidavits, Inv. Kearney stated, "[C.M.] also said that he gave Brandon Seys a 'Tec 9' handgun before [C.M.] went to jail." there was no argument that the confidential source was a "Reliable Source," with a track record of arrests. It appears that the police used a confidential source which means the culpability had to be corroborated. There was no mention of a "Reliable Informant" being used.

For the Court to have allowed the statement "I may or may not have" was ridiculous because just like the cardinal rule of statutory construction statements in court on the record use the "plain meaning of the language." The Court gave the investigator another pass when it stated that Inv. Kearney took the comment as C.M.'s somewhat "sarcastic" attempt to put a veneer of denialability on an admission while he was cooperating. The Court further stated, in this context, the statement "I may or may not have" transferred a gun is entirely consistent with the interpretation Inv. Kearney gave in his affidavit. The Court circumvented the argument by stating that Seys makes too much of Inv. Kearney's testimony at the detention hearing that C.M. gave him "firearms" rather than a single "firearm," in an attempt to sweep the issue under the carpet. The Court alluded to the fact that

GROUND TWO Supporting facts continues:

his statement was in response to a more general question about "firearms":

> Q. Did [C.M.] have any information about Mr. Seys
> and firearms?
>
> A. Yes. [C.M.] stated that he has seen Mr. Seys
> with firearms and has given Mr. Seys firearms.

This is an instance where Inv. Kearney was referring to "firearms," rather than the single Tec-9 handgun or "firearm" C.M. discussed being transferred to Seys. The Court allowed Inv. Kearney's further testimony to explain Seys involvement with two "firearms" that supported the police decision to detain him. Inv. Kearney testified that the deleted video did not contain information that was either exculpatory or inculpatory to Seys and that he screenshots of anything relevant. This was only Inv. Kearney's testimony, who had a reason to lie. Inv. Kearney's failure to preserve the videos did constitute a due process violation. Seys should have been allowed to withdraw his guilty plea, where he can use the new evidence that Inv. Kearney whereas it is averred that he committed perjury twice and lied to Ms. Nydle not only to impeach Inv. Kearney, but also to "establish that the investigation into Seys as a whole cannot be trusted either."

Seys argued that at the August 28, 2019 hearing, Inv. Kearney "alternatively denied, deflected, or played dumb" when questioned about a video of the Hilton Garden Inn that was allegedly edited by the Government before being provided to defense counsel. Security footage from the hotel/casino does demonstrate this to be another false claim by Inv. Kearney. The Court felt that there is ample evidence on the record to support the decision to issue a search warrant based on Inv. Kearney's affidavit. At the suppression hearing, Inv. Kearney "was forced to concede that the officer who actually authored the investigation report regarding this incident, Agent Mulnix, indicated that the items that passed between the unidentified white male and Ms. Davey could not be identified." Judge Williams reasoned: There are no facts in the record to support the assertion that Inv. Slight was able to identify the object passed while SA Mulnix also could not, which negates probable cuase for the issuance of the search warrant in the first instance.

In an opinion by Judge Williams, the Court overruled Seys' objections by adopting Judge Roberts' report and recommendation with minor legal modifications and denied Seys' motion to withdraw his guilty plea. Inv. Kearney was never certain of the "lookback" period for the Milestone camera, i.e., or how long the video was saved for at least the short term, he knew it was at least a few days, but how is that Seys' problem. Inv. Kearney testified that sometime shortly after December 23, 2018, he learned that the State server was not saving all the surveillance footage from the Milestone camera and tht if he had wanted the footage saved, he should have provided hard drives to the Stet prior to the camera installation. Inv. Kearney testified that he took no "affirmative steps to destroy or get rid of any evidence," yet through his negligence, potential substantive footage was lost.

Inv. Kearney further testified that he did not "intentionally get rid of any evidence," or "get rid of any evidence that he knew would be exculpatory for the purpose of avoding it for use by Seys or the defense. The problem is that Inv.

13

GROUND TWO Supporting facts continues:

Kearney should have known.

The Milestone Documentation/XProtect Web Client/Retention time and storage of recordings and investigations explain:

The retention time of video recordings is a setting in XProtect Management Client that defines how long the recordings are stored in the system database. By default, the retention time period is seven days. If you want to change the retention time or the maximum database size, contact your system administrator. When the retention time expires, the recordings are deleted.

On the Views tab and the Investigations tab, you can play back video recordings not older than the number of day defined in the retention time settings.

If you want to prevent your recordings from being deleted, you must create an investigation on the Investigations tab. When you create this investigation, you can play back, export, and download the videos even if the recordings have been deleted from the system database.

In XProtect Management Client, the system administrator can also enable a setting for the investigation retention time that defines how long the investigations are stored on the mobile server. By default, the retention time period is seven days. When you enable this setting, all investigations that have been created before the retention time period are deleted.

To prevent your investigations from being deleted, you can prepare video exports and download the investigations on your computer.

Counsel's failure to obtain this information from the manufacturer regarding the functions within the video management software and or hardware components of the server was prejudice. The fact that the flies are not complete (24 hours) for a certain day or date range shows that files were deleted while others were not, demonstrate a software or hardware failure, which if found out was wrong was not Seys' fault. Had counsel investigated this by contacting the manufacturer regarding the functions within the video management software and or hardware components of the server there is a reasonable probability the outcome of the proceeding would have been different.

(2) If you did not raise this issue in your direct appeal, explain why:   issue did not become available until all appeals had concluded.

_____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

15

**GROUND THREE:** Whether counsel rendered constitutionally ineffective assistance for failing to challenge the government's failure to prove purity of 80% methamphetamine?

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Seys pled guilty to conspiracy to distribute methamphetamine. The parties entered into a written plea agreement and agreed to the following guideline stipulations,

> For Count 1, the base offense level is at least 32 based upon the defendant's involvement with at least 150 grams of ice methampethamine. The parties agreed the prosecutor is free to present evidence and arguments to support the stipulated base offense level and, if warranted, a higher base offense level.

The United States Sentencing Guidelines (U.S.S.G. distinguish between mixtures involving run-of-the-mill methamphetamine and methamphetamine that is at least 80% pure. USSG 2D1.1, note C. The latter the Guidelines refer to as "ice," and that definition comes with it sentences that are substantially higher than those for non-ice methamphetamine.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☒

(2) If you did not raise this issue in your direct appeal, explain why: Issue did not become available until all appeals had concluded.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐   No ☐

16

GROUND THREE Supporting facts continues:

Seys contends counsel was constitutionally ineffective for not challenging the government's failure to meet its burden of proving that the substance in which he dealt was ice methampetamine, and therefore he should have been sentenced as though he was involved in a conspiracy to distribute methamphetamine that is less than 80% pure.

The government indicted Seys on conspiracy to distribute at least 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine or 50 grams or more of actual (pure) methamphetamine, pursuant to 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 846. Seys pled guilty to the charge.

During the sentencing phase, counsel made no objections to the PSR's classification of the drugs as "ice." The sentencing guidelines define ice as a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity. Therefore, at sentencing, the government must prove that the methamphetamine attrobuted to Seys is more likely than not methamphetamine as described in the United States Sentencing Guidelines.

The United States Sentencing Guidelines note to U.S. Sentencing Guidelines Manual 2D1.1, and courts have held, that a district court may not use purity, as a reason for an upward departure in a methamphetamine case, as the Guidelines already account for purity. In short, purity matters for methamphetamine.

Although counsel initially disputed the quantity determination to which Seys should be held accountable, no objections were made to the classification of the drugs as "ice." Individuals used the word "ice" to describe the drugs they procured and distributed. For example Kim Stonehocker when asked what kind of methamphetamine were you getting from Mr. Seys, responded "ice." Daniel Findley stated he was arrested with approximately 11 grams of "ice" methamphetamine he received from Seys.

Michael Selle stated he purchased 1/4 pound quantities of "ice" methamphetamine from Seys at a time (2 occasions x 113.4 grams = 226. 8 grams). (PSR, ¶6.)

Robbie Hess testified that he had purchased methamphetamine from Seys on six to ten occasions. The most Hess received on any single occasions was 1/2 ounce 114.18 grams quantity of methamphetamine. Hess also received gram quantities to 8-ball (3.5 grams) quantities from Seys (4 occasions x 1 gram = 4 grams + 14.18 grams + 3.5 grams = 21.68 grams). (PSR, ¶11.)

Ryan Drew stated from September 2018 to his incarceration on October 9, 2018; he, Cimaron Mann, and Michael Schueller had purchased approximately 40 pounds (18,144 grams) of "ice" methamphetamine from Seys. (PSR, ¶12.)

Inside Seys' vehicle, law enforcement recovered 183.39 grams of actual (pure) methamphetamine. (PSR, ¶15.)

Kelly Burke testified that she purchased two eight balls (7 grams) of methamphetamine from Seys. (PSR, ¶18.)

Kim Hentges testified that she received "ice" methamphetamine from Seys off and on between July 2018 and about December 2018. When she was receiving "ice" methamphetamine from Seys, she received approximately an ounce of "ice" methamphetamine per week (2 occasions x 28.35 grams = 56.7 grams). She also admitted receiving two ounces (56.7 grams), on one occasion. (PSR, ¶19.)

17

GROUND THREE Supporting facts continues:

Case law has evolved to distinguish one form of a drug from another developed in response to an attempt to distinguish crack from other forms of cocaine base where no lab test or rigid definition exists to distinguish between the drugs. Ice, however, is different, not only because of the availability of lab tests and precise definitions, but also because of a congressional choice about purity.

Drug purity cannot reasonably be described as a circumstance that the Commission has overlooked or inadequately considered. Both the relevant statutes and the Guidelines use the formular "mixture or substance containing a detectable amount" of a given drug. E.g. 21 U.S.C. §841(b)(1)(A)(i). The possibility of converting to a uniform purity - whether 100% purity or "street-level" purity - was considered and deliberately rejected. When defendants who sold a highly dilute drug objected that the "detectable amount" approach greatly magnifies their punishment compared with people who sell a more concentrated drug, the Supreme Court responded this outcome is the result of deliberate choices by Congress and the Sentencing Commission. Statutes and Guidelines allow conversion to a uniform purity for PCP and methamphetamine, and the Guidelines now allow a conversion for LSD, which reinforces the conclusion that for other drugs Congress and the Commission have rejected a common-purity approach.

The Sentencing Commission did not reject a purity approach for methamphetamine ice, to the contrary, it emphasized it. The Guidelines dictate that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG 2D1.1, note A. And then the Guidelines note the exception for ice, which is defined as a "mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity." USSG 2D1.1, note C. This both subject to a rigid definition and testable.

It is abundantly clear that the "80%" language has meaning. And although it makes sense in the context of crack and cocaine to define the users, dealers, and law enforcement officers as the experts in the field at distinguishing between the drugs, it cannot carry the government's burden in a case alleging methamphetamine ice. The government must prove, albeit only by a preponderance of evidence at sentencing, that the substance was, in fact methamphetamine of at least 80% purity. It defies common sense that even the most experienced dealer, user, or police officer could somehow detect the difference between 79% pure methamphetamine and 80% pure methamphetamine.

Given this understanding of the government's burden, we can eliminate all of the evidence in the nomenclature category in which the argument is that everyone referred to the drug as ice. We simply have no idea whether it is customary with in this circle of users and dealers to refer to any methamphetamine as "ice," or whether they confine that term to methamphetamine that would qualify as ice under the guidelines - that is, methamphetamine of at least 80% purity. It is possible that in this particular cohort, ice is used interchangeably for any form of methamphetamine. Scientific testing of at least part of a quantity of suspected "ice" methamphetamine is one of the strongest means by which the government can meet its burden of proving the methamphetamine attributed to a defendant is "ice" as defined in the Guidelines.

At sentencing the district court found based on Kim Hentges 453.6 grams of ice; Daniel Findley's 62 grams of ice; Robbie Hess 21.68 grams of ice and the seized ice methamphetamine 178.92 grams of converted drug weight of 14,372 kilograms of converted drug weight. The grams mixture found credible 14 kilograms

18

GROUND THREE Supporting facts continues:

of converted drug weight.  The cocaine Seys was found in possession 10.03
kilograms of converted drug weight, a calculation that come out to 14,415.03
kilograms of converted drug weight.  The guideline table 2D1.1(c), that is
consistent with right in the middle of a level 34.  More than 10 kilograms, but
less than 30 kilograms of converted drug weight.  Finding drug weight to be a
reasonable estimate.  See, Sent. Tr. at p.110-111.

Counsel's failure to challenge the government's failure to meet its burden
of proof that the substance in which Seys dealt was ice methamphetamine was
prejudice.  Seys was held accountable for 14,415.03 kilograms converted drug
weight (base offense level 34), instead of 1,451.43 kilograms converted drug
weight (base offense level 32), within the stipulated base offense level in the
signed written plea agreement.  His advisory guideline range was increased from
210 to 262 months to 262 to 327 months.  A claim that trial counsel was ineffective
at sentencving is cognizable under 2255.  Thus, although a federal prisoner may
not directly attack a sentencing error under, §2255, he may claim that counsel's
failure to raise issue constituted ineffective assistance.

The drug purity that can raise the guideline range must be established by
the government by a preponderance of reliable evidence.

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:** Whether counsel rendered constitutionally ineffective assistance for failing to move for downward variance based on guidelines unnecessary harsh with regard to actual (pure) methamphetamine, treating such methamphetamine ten times more severely than methamphetamine mixture.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Judge Bennett, in the Northern District of Iowa, Eastern Division, noted that the Guidelines establish a 10-to-1 ratio in their treatment of actual (and ice) methamphetamine, as compared to methamphetaine mixture. He announced policy disagreement with the methamphetamine Guidelines. After addressing the ability of a federal district court to deviate from the Guidelines on the basis of a policy agreement, he set forth varies reasons as to why he continues to have a policy disagreement with the methamphetamine Guidelines including:

      1. The 10-to-1 ratio established in the Guidelines is not based on empirical evidence, creating

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

    Yes ☐    No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

    Yes ☐    No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

20

GROUND FOUR Supporting facts continues:

> Guideline ranges for actual (and ice)
> methamphetamine that are excessive and
> not "heartlands."

> 2. Drug purity is not an accurate proxty for
> culpability in light of the fact that nearly
> all methamphetamine trafficked in recent
> years has been substantially pure.

Judge Bennett found the appropriate remedy to be a one-third reduction in the advisory range when that range was calculated pursuant to the actual (and ice) methamphetamine Guidelines. Judge Bennett noted that a low-level, generally non-violent addict dealer, requires computing an alternative Guidelines range using the methamphetamine mixture Guidelines.

Seys contends had counsel requested an downward various based on the 10-to-1 ratio established in the Guidelines was not based on empirical evidence there is a reasonable probability, based on the precedent set in the Northern District of Iowa, Eastern Division, by Judge Bennett - Seys would have received a Guideline range using the methamphetamine mixture less than 324 months on the conspiracy count.

GROUND FIVE:  In light of Bruen §922(g)(1) is facially unconstitutional
as applied to Seys.

Supporting facts:

    The founding-era legislatures did not stop felons of the right to bear arms
simply because of their status as felons. Founding-era legislatures imposed virtue-
based restrictions on civil rights like voting and jury service, not to individual
rights like the right to possess a gun.  In 1791 - and for well more than a century
afterward - legislatures disqualified categories of people from the right to bear
arms  only when they judgment that doing so was necessary to protect the public
safety.

    18 U.S.C. §922(g)(1) would stand on solid footing if its categorical ban was
tailored to serve the governments' undeniably compelling interest in protecting the
public from gun violences.. But its dispossession of all felons - both violent and
nonviolent - is unconstitutional as applied to Seys, who was convicted of conspiracy
to distribute methamphetamine.

    The Second Amendment provides: "A well regulated Militia, being necessary to the
security of a free State, the right of the people to keep and bear Arms, shall  not
be  infringed."

        A.  The Supreme Court in Bruen laid out a
            new standard for courts to use when
            analyzing firearm regulations.

    Before Bruen, courts of appeals had "coalesced  around a "two-step" frame
work when assessing Second Amendment claims, combining a historical analysis with
scrutiny. For the first step, the court would establish the Second Amendment's
originals scope through a historical analysis.  If the regulated conduct fell
outside the Amendment's original scope, "the analysis can stop there; the
regulated activity is categorically unprotected."  But it not outside the Amendment's
scope or "inconclusive," the court would proceed to step two.

    In step two, a court would generally analyze "how close the law carries to the
core of the Second Amendment right and the severity of the law's burden on that
right." If the "core" Second Amendment right-self-defense is one's home - was
burdened, the court would apply strict scrutiny.  Otherwise, it would apply
intermediate scrutiny, considering whether the government had shown that the
regulation is substantially related to the achievement of an important governmental
interest.

    But in Bruen, Justice Thomas stated the two-step approach was "one step too
many."  In its place, Justice Thomas enumerated a new standard courts must follow:

                "[W]hen the Second Amendment's plain text
                covers an individual's conduct, the
                Constitution presumptively protects that
                conduct. The government must then justify
                its regulation by demonstrating that it is
                consistent with the Nation's historical
                tradation of firearm regulation.  Only then
                may a court conclude that the individual's
                conduct falls outside the Second Amendment's
                "unqualified command."

GROUND FIVE Supporting facts continues:

So the threshold question is whether the Second Amendment's plain text covers Seys' conduct.

      B.   Bruen's First Step: "possessing a firearm under the Second Amendment's plain text.

     Seys is charged with violating 18 U.S.C. §922(g)(1), which makes it "unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to ... possess any firearm or ammition... which has been shipped or transported in interstate or forgeign commerce.

     Whether "keep and bear arms" covers possession of a firearm - it does. According to Justice Scalia, to "keep arms" means to "have weapons." The plain meaning of "have" is "to be in possession of." Thus, the Second Amendment's "keep and bear arms" language plainly encompasses possession.

     Buren conflicts with Heller. Heller called proscriptions against felons possessing guns "presumptively lawful." In contrast, because possession is covered by the Second Amendment's plain text, Bruen makes a felon's possession of a firearm "presumptively constitutional." Bruen is the controlling standard, but this conflict - the presumption of constitutionality - is what places the heavy burden on the government.

     In any event, Bruen's first step asks a strickly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm. Because the constitution presumptively protects possessing a firearm, §922(g)(1)'s constitutionality hinges on whether regulations prohibiting felons from possessing a firearm are consistent with the nation's historical tradition of firearm regulation.

     History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are dangerous.

       C.   Bruen's second step: the historical analysis

     There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people - for example, violent felons - who fall entirely outside the Second Amendment's scope. Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.

     The latter is the better way to approach the problem. It is one thing to say that certain weapons or activities fall outside the scope of the right. It is another thing to say that certain people fall outside the Amendment's scope. Arms and activities would always be in or out. But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required.

GROUND FIVE Supporting facts continues:

Under this theory such a person could possess a gun as a matter of legislative grace. But he would lack standing to assert constitutional claims that other citizens could assert. For example, imagine that a legislature disqualifies those convicted of crimes of domestic violence from possessing a gun for a period of ten years following release from prison. After fifteen years pass, a domestic violence misdemeanant challenges a handgun ban identical to the one that the court held unconstitutional in Heller. Despite the legislative judgment that such a person could safely possess a gun after ten years, a court would still have to determine whether the person had standing to assert a Second Amendment claim. If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the statutory disqualification expires. If domestic violence misdemenants are out, they're out.

That is an unusual way of thinking about rights. In other contexts that involve the loss of a right, the depriavtion occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints). Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected. So too with the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes eligible to lose it.

In addition to being analytically awkward, the scope of the right approach is at odds with Heller itself. There, the court interpreted the word "people" as referring to "all Americans." Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise posses, rather than whether they possess the right at all.

Seys falls within the scope of the Second Amendment but can Congress prevent him from possessing a gun.

Heller did not "undertake an exhaustive historical analysis... of the full scope of the Second Amendment; but it did offer a list of "presumptively lawful regulatory measure," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." The constitutionality of felon dispossession was not before the court, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear.

The task to determine whether all felons - violent and nonviolent alike - compose one such category.

The historical evidence does, however, support that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than "felons" - it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.

The best historical support for a legislature power to permanently disposses all felons would be founding-era law explicitly authorizing the legislature to

GROUND FIVE Supporting facts continues:

impose - such a ban.  But at least thus far, scholars have not been
able to identify any such laws.

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

_____

(3)   Did you receive a hearing on your motion, petition, or application?

　　　 Yes ☐          No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

　　　 Yes ☐          No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

　　　 Yes ☐          No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue:

_____

_____

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which
ground or grounds have not been presented, and state your reasons for not presenting them:

_____

26

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the
    you are challenging?    Yes ☐    No ☐

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
    issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the
    judgment you are challenging:
    (a) At the preliminary hearing:
        Michael K. Lahammer, Lahammer Law Firm PC, Cedar Rapids, Iowa
    (b) At the arraignment and plea:
        Michael K. Lahammer, Lahammer Law Firm PC, Cedar Rapids, Iowa
    (c) At the trial:

    (d) At sentencing:
        John Bishop                              Cedar Rapids, Iowa
    (e) On appeal:
        John Bishop                              Cedar Rapids, Iowa
    (f) In any post-conviction proceeding:

    (g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court
    and at the same time?    Yes ☐    No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are
    challenging?    Yes ☐    No ☒
    (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

    (b) Give the date the other sentence was imposed:
    (c) Give the length of the other sentence:
    (d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or
    sentence to be served in the future?    Yes ☐    No ☐

27

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This §2255 motion is being filed within one year of the final judgment entered in this case on March 1, 2022. See Clay v. United States, 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003)("Here, the relevant context is postconviction relief, a context in which finality has a long-recognized, clear meaning: Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.)).

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:
    A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –
    (1) the date on which the judgment of conviction became final;
    (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
    (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief: vacate judgment, and order the relief that is deemed appropriate and just in accordance with the law.

_____

or any other relief to which movant may be entitled.


_____
Signature of Attorney (if any)


I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ *March 13 2023* _____.
                                                                                    (month, date, year)


Executed (signed) on  *March 13th 2023*   (date)


_____
Signature of Movant
Brandon James Seys
#17827-029

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.


29



Brandon James Seys
# 17827-029
Federal Correctional Institution
Williamsburg Medium
P.O. Box 340
Salters, S.C. 29540

LEGAL MAIL

U.S. POSTAGE PAID
PM
SALTERS, SC
29590
MAR 15, 23
AMOUNT
$0.00
R2303S103956-01
RDC 04    52401

United States Courthouse
Northern District of Iowa
111 Seventh Avenue, SE 5th Floor
Cedar Rapids, Iowa 52401-2101

LEGAL MAIL

PRIORITY MAIL
TRACKED INSURED
UNITED STATES POSTAL SERVICE
For Domestic and International Use
Label 107R, May 2014

CERTIFIED MAIL
7017 1000 0000 8236 1477