Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

RECEIVED

JUN 16 2023

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE

| | | |
|---|---|---|
| BRANDON JAMES SEYS, | ) | No. 23-CV-1004 CJW-MAR |
| | ) | (19-CR-1004 CJW-MAR) |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | NOTICE OF MOTION FILING |
| | ) | AND SERVICE |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | The Hon. C.J. Williams |
| | | United States District Judge |

To:   United States Attorneys Office
      Northern District of Iowa
      Hatch Building, Suite 400
      401 First Street, S.E.
      P.O. Box 74950
      Cedar Rapids, Iowa 52407-1990

PLEASE TAKE NOTICE that on the 7th day of June, 2023, the undersigned shall cause to be filed with the Office of the Clerk for the United States District Court for the Northern District of Iowa, Eastern Dubuque, 313 U.S. Courthouse, 320 Sixth Street, Sioux City, Iowa 51101,

MOTION TO REOPEN SECTION 2255 AND
MOTION TO ALTER OR AMEND JUDGMENT
(Fed. R. Civ. P. 60(b)(1) & 59(e))

service of which is being made upon you.

Dated: June 7th, 2023

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

2

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE

| | | |
|---|---|---|
| BRANDON JAMES SEYS, | ) | No. 23-CV-1004 CJW-MAR |
| | ) | (19-CR-1004 CJW-MAR) |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | MOTION TO REOPEN SECTION |
| | ) | 2255 AND MOTION TO ALTER |
| UNITED STATES OF AMERICA, | ) | OR AMEND JUDGMENT |
| | ) | |
| Respondent. | ) | |
| | | The Hon. C.J. Williams |
| | | United States District Judge |

Brandon James Seys files a Motion to Reopen Section 2255 and Motion to Alter or Amend Judgment, pursuant to Federal Rules of Civil Procedure 60(b)(1) and 59(e).

Federal Rule of Civil Procedure 60(b) permits a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances." Kemp v. United States, 142 S.Ct. 1856, 1861, 213 L.Ed.2d 90 (2022). One of those circumstances consist of "mistake" a judge's errors of law. The Supreme Court in Kemp concluded, based on the text, structure, and history of Rule 60(b), that a judge's errors of law are indeed mistakes under Rule 60(b)(1).

3

Under Rule 59(e), a court may alter or amend a judgment upon a motion filed no later than 28 days after entry of the judgment. Fed. R. Civ. P. 59(e). Rule 59(e) gives the court power to rectify its own mistake in the period immediately following the entry of judgment. White v. N.H. Dep't of Emp't Sec., 435 U.S. 445, 450, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). Rule 59(e) motions are limited, however, to correcting "manifest errors of law or fact or to present newly discovered evidence." U.S. v. Metro St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2016)(quoted cases omitted).

The district court erred by failing to liberally construe Seys's pro se complaint to allow for the development of a potentially meritorious case. For the below reasons the motion should be granted.

I.  Statement of the Case

This case involves the use of a GSP tracking device on Seys's vehicles. On November 30, 2018, a County of Dubuque, Iowa, Judge issued a search warrant authorizing law enforcement to place a global positioning system (GPS) tracking device on a Silver 2005 Caddallac CTS, and a Silver 2005 Chrysler Town and Country Van, both of which Seys had a reasonable expectation of privacy.

In Ground One Seys argued his trial counsel rendered ineffective of counsel at the suppression hearing. Placement of a GPS tracking device on a vehicle is a search within the meaning of the Fourth Amendment, requiring probable cause and a warrant. Probable cause exists when, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place or the requested search will lead to the discovery

4

of evidence. This requires a nexus between the items officers are searching for and the place or items to be searched.

Ground One: Whether counsel rendered ineffective assistance of counsel at suppression hearing?

During the suppression hearing counsel argued the November 30, 2018, GPS search warrant was based on an affidavit which was clearly lacking in sufficient indicia of probable cause. The information provided in the underlying affidavit it was stale, vague, misleading and wholly insufficient to provide the necessary probable cause to issue the GPS search warrant.

The affidavit submitted in support of the application for the GPS search warrant states:

"During the end of 2017 or beginning of 2018, Inv. Chad Leitzen met with Michael John Selle while in the area of Stafford Street and Providence Street. Selle advised Inv. Leitzen that he would like to provide information to the Duduque Drug Task Force (DDTF) about a large-scale methamphetamine dealer in Dubuque. Selle identified the subject as Brandon Seys. He was fully identified as Brandon James Seys.

Selle stated that Seys regularly makes trips to Kansas City in order to pick up large amounts of methamphetamine. He then transports the meth back to Dubuque to sell it.

Selle stated that he (Selle) recently broke up with his girlfriend, Kimberly Rene Stonehocker who was in jail in Dubuque County on the date Inv. Leitzen spoke to Selle. Selle stated that after he and Stonehocker broke up Stonehocker began dating Seys. Selle stated that Stonehocker recently took a trip to Kansas City with Seys at which time Seys picked up methamphetamine and

5

transported it back to Dubuque in order to sell it.

Selle was in possession of Stonehocker's phone at that time. He opened up Google Maps on her phone and accessed the history tab which showed a recent visit to a hotel in Kansas City. Selle advised that Stonehocker had told him that is where they met Seys's methamphetamine supplier. Selle advised that Inv. Leitzen could speak to Stonehocker and she would be willing to provide him with information on Seys as well.

A short time after speaking with Selle, Inv. Leitzen did meet with Stonehocker at the Dubuque County Jail. Inv. Leitzen asked her to tell him about Brandon Seys. Stonehocker stated that she had recently dated him for a short time and while they were dating, Stonehocker took a trip with Seys to Kansas City. She stated that she thought they were going to Kansas City to visit some of Seys's family, but instead they went to a hotel and met with a methamphetamine supplier. Stonehocker stated that Seys acquired some methamphetamine from the supplier and they returned to Dubuque so Seys could sell the meth. Stonehocker stated that she could not remember exactly where the hotel was, but if Inv. Leitzen were to talk to Mike Selle, Selle would show him the Google Maps history in her phone. She stated that the hotel location was saved in her phone. Stonehocker was unaware how much methamphetamine Seys had acquire from his supplier.

On April 30, 2018, Inv. Leitzen met with Selle while he was incarcerated at the Dubuque County Jail. Selle advised that he would, again, like to provide information to the DDTF. Selle stated that there were several subjects in Dubuque who he could purchase

6

methamphetamine from, but one of the biggest suppliers of methamphetamine in Dubuque that he knew of was still Brandon Seys. Selle stated that it would be normal for him to purchase 1/2 pound of ICE methamphetamine from Seys at a time.

On May 26, 2018, the Muscatine County Sheriff's Office investigated a motor vehicle accident in the city of Muscatine. A motor vehicle had crashed into an unoccupied parked vehicle. The occupants did leave the scene. Two backpacks were located near the scene of the crash. Inside the bookbags, a total of 8.5 ounces of methamphetamine was located. Also located in the backpacks were spiral notebook that contained the name of Brandon Seys.

On Tuesday, October 16, 2018, Inv. Leitzen spoke to Daniel Gene Findley after he was arrested for being in possession of approximately 11 grams of ICE methamphetamine. Findley stated that he had gotten that methamphetamine from Brandon Seys the night before and owes Seys $400 for it.

Findley stated that Seys was the biggest methamphetamine dealer in Dubuque at that time. He stated that Seys drives a silver minivan or silver car, but he did not know the license plates on either vehicle.

Findley stated that Seys is dating a female subject named Liz Davey. She was fully identified as Elizabeth Kay Davey. Findley stated that Seys is living with Davey, and he did not know where their house was.

Findley provided a phone number of 563-587-9832 for Seys and also showed Inv. Leitzen the text messages and call logs between himself and Seys. The text meassages were vague, but Findley

7

stated that it was coded drug talk with Seys.

Findley stated that Seys get multiple pounds of ICE methamphetamine from an unknown subject in Kansas City. He stated that Seys makes trips to Kansas City every week or two in order to pick up methamphetamine and bring it back to Dubuque to sell.

Findley also advised that Seys own several guns and always has one in his possession. According to Findley, Seys has stated that he will shoot it out with police if they ever came to arrest him. Findley stated that Seys is very paranoid and he fully believes Seys will do that.

On October 10th, I, Investigator Kearney, did meet with Dubuque County Jail inmate Cimaron Mann who wanted to provide drug information on Brandon Seys. Mann stated that he used to purchase large amounts of methamphetamine from Seys prior to being incarcerated. Mann said that Seys is bringing in 5 to 10 kilos of methamphetamine into the Dubuque area on a consistent basis. Mann said that Seys does travel to different cities to bring back methamphetamine which include Davenport and Cedar Rapids. Mann said that Seys does operate a silver colored van. Seys also is in possession of a .40 caliber handgun and carries around large amounts of U.S. currency which exceeds $100,000 dollars. Mann also said that Seys's girlfriend is Elizabeth Davey.

On October 29, 2018, I did speak to CI #12117 who wanted to provide information on a subject involved with selling a large amount of methamphetamine. CI #12117 stated that they observed Kim Hentges selling methamphetamine this summer into early fall. CI #12117 said that Hentges source was a white male in his 40's that drove a silver colored van. CI #12117 said that they heard Hentges

8

and this white male talk about pounds of methamphetamine getting transported to Dubuque. Through a photo lineup, CI #12117 did positively identify the subject driving the silver van as Brandon Seys.

On October 26, 2018 Investigators observed a silver Cadilla parked at 740 Boyer Street in Dubuque, the residence where investigators believed Seys was residing at the time. The aforementioned Cadillac bore Iowa registration plate "HLE743," which was registered to James Kringle of 3075 Oak Crest Drive, Dubuque, Iowa. Officers observed that while the Cadillac was parked at 740 Boyer Street, two other vehicles which were both registered to Seys were parked there also. Those vehicles included a silver Chrysler Town and Country Van (bearing Iowa registration plate "GZL536") and a silver Chevrolet Monte Carlo (bearing Iowa registration plate "GZL108"). Officers subsequently observed the Cadillac at the residence on Boyer Street (along with the two vehicles registered to Seys) on multiple occasions.

On Monday October 29, 2018 Special Agent Joshua Mulnix, of the Division of Narcotics Enforcement, spoke with Special Agent Jarrettt Harvey, of the Division of Criminal Investigation, at the Rhythm City Casino in Davenport, Iowa. At that time, Special Agent Harvey talked to Special Agent Mulnix about recent occasions when Seys and Elizabeth Davey had spent time at the Rhythm City Casino, Special Agent Mulnix and Investigators with the Dubuque Drug Task Force coordinated with Special Agent Harvey to submit subpoenas to the Rhythm City Casino for casino surveillance video recordings, as well as casino database information pertaining to Seys and Davey.

9

Rhythm City casino surveillance records and date documented that Seys and Davey were at the Rhythm City Casino on October 13, 2018. Special Agent Mulnix and Investigator Slight reviewed surveillance video, with the assistance of Special Agent Harvey, and confirmed Davey's appearance in the surveillance video was consistent with other photographs of her they had previously observed. They also reviewed surveillance video and confirmed Seys's appearance in surveillance video was consistent with other photographs of him they had previously observed of him.

After reviewing the October 13, 2018 surveillance footage from Rhythm City Casino, it appears Brandon Seys, Elizabeth Davey and a unidentified white male (hereinafter "UMI")) enter the casino together. Surveillance footage does show "UMI" count out cash and set it near the slot machine where Davey was seated. Davey then reached into her pursue and hands "UMI" a bag containing a white colored substance. Surveillance footage then shows Seys, Davey and "UMI" inside a silver Cadillac that appeared to have a temporary rear plate. The Cadillac then drove from the parking lot with Seys in the driver's seat.

Through subpoenaed casino records, Brandon Seys and Elizabeth Davey did gamble at Isle of Capri in Bethendorf Iowa on October 24 and 25 and during that time Seys played over $12,000 dollars worth of chips at the casino.

On October 30, 2018, Investigators from the Dubuque Drug Task Force observed a silver Cadilla bearing Iowa plate HLE743 parked at the "Q Casino." Investigators did observe Brandon Seys inside the casino playing at the table games. Investigators then observed

10

Seys leave the casino in the aforementioned Cadillac. The silver Cadillac was later observed parked at 740 Boyer Street in Dubuque, Iowa. This address is known to be occupied by Kim Hentges.

On November 6, 2018, I did again speak to Dubuque County Jail inmate Cimaron Mann. Mann said that Seys is staying at Kim Hentges resident in Dubuque which is considered his safe house. Mann said that he (Mann) has seen Kim Hentges on multiple occasions. Mann went to jail.

On November 19, 2018, Investigators met with the Dubuque County Jail inmate Robbie Hess on the jail floor. Hess stated that the main supplier methamphetamine in Duque was Brandon Seys. Hess has seen Seys in possession of multiple pounds of methamphetamine. Hess stated that Seys drive a silver van and a light-colored Cadillac. Hess said that Seys has multiple suppliers for methamphetamine that is in different cities including Kansas City, Cedar Rapids and Joliet Illinois. Hess also states that methamphetamine is brought to Seys from a subject that live in Minnesota.

Based on this information, the officer applied for a search warrant authorizing law enforcement to place a global positioning system tracking device on Seys silver 2005 Cadillac CTS and a silver 2005 Chrysler Town and Country Van.

The district court found Seys's Section 2255 motion on this ground was without merit and denied the issue.

Seys's counsel sought to suppress all physical evidence seized during these searches, and dismissal of the case. Counsel believed if the evidence seized because of the GPS tracking of Seys's vehicles could not be used, Seys could not be prosecuted.

11

On May 16, 2019, counsel filed a motion to quash search warrants and suppress evidence arguing that law enforcement violated Seys's Fourth Amendment rights during a search pursuant to a warrant for the placement of GPS's trackers on Seys's vehicles because the warrant affidavit lacked probable cause and seeking to suppress subsequent warrants as fruit of the poisonous tree.

The court held evidentiary hearings on June 5, 2019, and August 28, 2019.

Counsel argued that the evidentiary hearings established the following reasons to support a suppression of the evidence, noting that the paragraph numbers from the affidavit corresponded to the paragraphs below by number:

(Affidavit ¶4,5) Deputy Kearney couldn't explain why M.J.S. wanted to provide information about Seys. Further, he couldn't give a date when the alleged conversation ever took place. He didn't know why M.J.S. met with Inv. Leitzen at Stafford St. The only explanation given by Kearney is he didn't talk to M.J.S. and he knows no specific information of the meeting.

Further, M.J.S. was unable to provide any proof of Seys making any trips to Kansas City or why he believed that Seys had transported any meth back to Dubuque. No dates or any details were provided.

(Affidavit ¶6,7) Deputy Kearney couldn't explain why M.J.S. was in jail Kearney also couldn't explain why or how M.J.S. learned this information about this trip to Kansas City. No details were given.

(Affidavit §7) Deputy Kearney couldn't explain why, when or how M.J.S. was in possession of K.S.'s phone. He wasn't able to

12

provide the specific number to this phone to in fact prove it was K.S.'s phone. He testified that Google Maps on her history tab was opened and it showed a recent visit to a hotel in Kansas City, but could not provide a screen shot or photos to show this. Deputy Kearney also couldn't explain why he provided no dates, or exact locations that were documented from her phone to prove this. Finally, the affiant could not provide any information or basis showing that M.S. even knew Mr. Seys.

(Affidavit ¶8,9) Deputy Kearney provided no date as to when Inv. Leitzen met with K.S. Further, he couldn't explain why M.J.S. had K.S.'s phone and why M.J.S. could not provide any dates or information about the hotel K.S. stayed at in Kansas City, despite allegedly seeing the phone shots. There was no explanation to even why none of the information was saved in K.S.'s phone.

In addition, evidence showed that M.J.S. was in jail 1/6/18 to 2/1/18, 3/16/18 to 3/20/18 and 4/19/18 to 5/2/18. Deputy Kearney could not explain why M.J.S. was in jail or even what he received in excahnge for this information. In addition, he could not give any details of any drug transactions or dates.

(Affidavit ¶10) Evidence disclosed that this paragraph was false in stating that Mr. Seys's name was found in "spiral notebook."

(Affidavit ¶11-16) Deputy Kearney admitted that D.F. never got the meth from Seys, and stated that D.F. allegedly picked it up in a parking lot. Further, Deputy Kerney stated that D.F. could not provide any details of the vehicles Seys drives, just the color. Deputy Kearney did admit that D.F. did work at a restaurant

13

and the text message could have been talking about food, and that the messages were "vague."

In addition, Kearney couldn't provide any information to why D.F. believed Brandon Seys got ice from Kansas City. Kearney did admit that he was unable to corroborate D.F.'s information that Seys travels to Kansas City ever week or two because through GPS and independent police work it was clear that neither Seys nor any of his vehicles ever left the state or went on any trip out of eastern Iowa.

Deputy Kearney admitted that D.F.'s information that Seys always had a gun on him and that he would shoot it out with police if they tried to arrest him was not supported by any of Brandon Seys's arrests, nor did Mr. Seys have a gun on him when he was arrested on the instant charges.

(Affidavit ¶17) Deputy Kearney admitted that C.M. was already in jail for 2 weeks when he gave this information, which was not disclosed in the search warrant affidavit. Further, C.M. provided no information showing a basis for the claim that he believed Mr. Seys was in possession of a .40 caliber handgun.

(Affidavit ¶18) Deputy Kearney admitted that he couldn't provide a date or place where CI#12117 said K.H. sold him dope.

(Affidavit ¶19) Deputy Kearney admitted that he left out the registration information on the silver van and silver Monte Carlo registered to Seys, which would have shown a Delmar, Iowa address. He only included the Cadillac information, which did not belong to Seys.

Case 2:23-cv-01004-CJW-MAR   Document 5   Filed 06/16/23   Page 14 of 51

(Affidavit ¶22) Deputy Kearney admitted that officers stated that you couldn't see a bag containing a white colored substance, or identify what the item was that was passed between the individuals. The police report from Agent Mulnix and Investigator Slight had observed the same footage that Deputy Kearney did, and they stated it was unclear what was given to UIM in the video. In addition, Deputy Kearney admitted that the video footage wasn't very clear.

(Affidavit ¶23) Deputy Kearney admitted that Brandon Seys never lost $22,000 on October 25th at Rhythm City Casino, and he intended this paragraph to state that he lost that amount through Oct. 25th. However, this was patently false as he also admitted that he was aware that Mr. Seys had won more than 30k on Oct. 6th at this casino, and in fact won more than $8k during the month at this casino.

(Affidavit ¶24) Deputy Kearney admitted that Mr. Seys never lost $12,000 at Isle of Capri on October 25th, and that he didn't know if he won or lost.

(Affidavit ¶26) Deputy Kearney admitted that C.M. was not at 740 Boyer Street on "multiple occasions," and was only there twice. In addition, Deputy Kearney said he recalled C.M. as being sarcastic when he stated that (as reported in the police report) he "may or may not have given Seys a Tec 9 before he went to jail. Deputy Kearney stated in the affidavit that C.M. said he gave Seys a Tec 9, despite the police report stating to the contrary.

(Affidavit ¶27) Deputy Kearney could give no dates or details to why R.H. believed Mr. Seys is a main supplier of meth in Dubuque. In addition, he could not give any time or date for when R.H. saw

Seys with meth. Deputy Kearney spoke to R.H. on November 19th and R.H. was already in jail for over a month at that time, which was not disclosed by Deputy Kearney.

In general the affidavit contained no criminal histories of any of the informants.

In sum, Brandon Seys's rights against unreasonable search and seizure and to due process of law as guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution were violated, and all evidence obtained as a result of the initial GPS search warrant issued on November 28, 2018, is tainted and should be suppressed.

BUT counsel did not argue the GPS installed on Seys's vehicles violated his rights where there was nothing in the affidavit attached to the warrant to establish that Seys's cars had been or was likely to be used in trafficking activities. The information obtained as a result of the GPS tracking device installed on Seys's vehicles were gathered in violation of Seys's rights.

Counsel's performance was deficient when he did not preserved Seys's right to appeal the denial of the suppression hearing when Seys enter his guilty plea. Seys was prejudice because had counsel preserved his right to appeal the denial of the suppression hearing there is a reasonable probability the outcome would have been different. Reasonable jurists could debate the issue should have been resolved in a different manner or the issue presented deserved further proceedings even though Seys did not prevail on the merits in the court considering his case at present. See United States v. Lopez-Zuniga, 2017 U.S. Dist. LEXIS 151275 (N.D. Iowa Sept. 18, 2017)(holding information obtained as a result of the GPS tracking

16

device installed on defendant's vehicle was gathered in violation
in violation of defendant's rights where there was nothing in the
affidavit attached to the warrant that established that defendant's
car had been or was likely to be used in trafficking activities;
the good faith exception did not apply because the officers relied
on a facially invalid warrant and there was no evidence presented
to overcome the deficiencies in the warrant, motion to suppress
granted); United States v. Green, 2021 U.S. Dist. LEXIS 226781
(D. Minn. Aug. 26, 2021)(granting motion for suppression).

> Ground Two: Whether counsel rendered constitutionally
> ineffective assistance at withdrawal of
> guilty plea hearing?

In late 2017 or early 2018 law enforcement began to investigate
Brandon Seys for alleged involvement in the distribution of
methamphetamine in the Dubuque, Iowa area. The investigation
culminated on December 30, 2018, when law enforcement executed
search warrants for Seys's person, a hotel room where he had been
staying that evening, his vehicle, a storage unit, and his residence
in Dubuque. Seys was taken into custody at the hotel and found to
be in possession of $10,792 in cash. Inside the hotel room, law
enforcement recovered 95.14 grams of cocaine and 183.39 grams of
methamphetamine. In Seys's vehicle parked outside the hotel, law
enforcement found several glass pipes, drug packaging material, and
a digital scale. At the storage unit law enforcement found two
handguns. At Seys's residence, law enforcement located one round
of ammunition.

A hearing was held on Seys's motion to withdraw guilty plea
on June 12, 2018. This case involved an alleged conspiracy to
distribute methamphetamine and cocaine.

17

On November 30, 2018, the DDTF commenced a 24 hour video surveillance using a Milestone surveillance camera on 740 Boyer Street, Dubuque, Iowa, a home associated with Seys as well as placed GPS monitoring devices on two automobiles he owned. The Milestone camera belonged to the State of Iowa. The State Division of Narcotics Enforcement ("DNE") and Agent Joshua Mulnix, who was also involved in the case, in their completed request form for the camera, DNE submitted a form which provided, "Note IP video will be maintained for no more than 30 days unless specifically requested." This Milestone camera remained in place until mid-January 2019. Seys was arrested on State charges on December 30, 2018 and has been in State of Federal custody since then.

In Seys's motion to dismiss, which was based on alleged due process violations from law enforcement's failure to preserve footage from the Milestone camera Seys appeared and pleaded guilty to Counts 1 and 3 of a superseding indictment. On January 27, 2020, Seys's attorney Michael Lahammer served a subpoena on SA Craig Mackaman. The subpoena requested "disclosure and presentation of copies of any video or other media that showed the residence at 740 Boyer Street within the time frames of November 20, 2018 to January 15, 2019."

SA Mackaman sent 72 two-hour video clips from 18 different days of video surveillance to Seys's counsel in response to the subpoena. SA Mackaman stated that he did look on the State server "Archive Folder" and found small clips of the Milestone video he believed was on December 30, 2018. SA Mackaman stated that sometimes the server will save small clips of video recordings on its own. SA Mackaman also said that the clips are scattered over

18

a couple weeks time period. Inv. Kearney told SA Mackaman that he asked DCI Agent Holly Witt back in May of 2019 if there were any Boyer Street videos on the server and she stated that she didn't see any. SA Mackaman said that the clips were only found in the Archive Folder.

In May, 2019, at the request of AUSA Emily Nydle, Inv. Kearney asked Agent Witt if there was any video remaining from the camera. Inv. Kearney did not expect there to be any video because he understood that video was not preserved if hard drives were not provided at the beginning of the recording process.

Inv. Kearney made representations in his search warrant application stating that video from the Milestone camera and physical surveillance showed certain things occurred at 740 Boyer Street. He stated if this case went to trial he would testify that certain persons known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street and Seys would frequently have black bags and/or brief cases in his possession when he left the house which was something he had observed on the Milestone video. To Inv. Kearney's knowledge none of the video that was lost included any inculpatory or exculpatory information. This is only what he testified to.

The district court in rejecting Ground Two states:

> "petitioner again seeks to relitigate a matter
> he litigated before this court, then appealed
> to the Eighth Circuit Court of Appeals and lost
> again. Much of petitioner's argument on this
> issue has nothing to do with alleged ineffective
> assistance of his attorney, but rather, attack
> the court's reasoning and holding. Petitioner
> bases this assertion apparently on information
> obtain from a website.

Petitioner's attorney was not ineffective. He
thoroughly litigated petitioner's motion to
withdraw his guilty plea on the ground that
new evidence showed video surveillance footage
could have been saved by the government but
was not, and that should have resulted in the
granting of petitioner's motion to dismiss,
justifying him withdrawing his guilty plea.
It was clear from the litigation over
petitioner's motion to withdraw that the
video equipment could save footage. Additional
information from the manufacturer to that
effect was not material to the issue of
whether petitioner could withdraw his guilty
plea.  Thus, petitioner's counsel was not
ineffective for failing to obtain and add that
additional information because it was already
established by other evidence that video footage
could have been saved.

Regardless, petitioner was not prejudiced by
counsel's failure to obtain this additional
information first because it was not material,
but also because the decision whether to allow
petitioner to withdraw his guilty plea did not
turn on this issue. Rather, the question turned
first on whether there was any evidence of a
Brady violation and the court found none.

To establish a Brady violation, Seys must show that the
prosecution suppressed evidence that was favorable to him and
material to either guilt or punishment.  Keys v. United States,
943 F.3d 1152, 1154 (8th Cir. 2019).  Evidence is material "if
there is a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would have
been different.

Seys argues that after the suppression hearing concluded he
had a conversation with his counsel.  Seys asked his attorney to
obtain from the Milestone manufacturer information pertaining to
the functions of the camera, so he could show Deputy Kearney lied
about the Milestone camera self-deletes. Seys explained to counsel
that the camera system had a storage system, called the "Cloud"

20

that saved all audio and video footage in case of emergency or system failure. Seys told counsel that the video footage could never be deleted unless it was purposefully done. Seys told counsel that none of the video footage would show he had black bags and/or brief cases in his possession when he left the house which was something Inv. Kearney referred to in his search warrant application used to obtain the search warrant, and none of the video footage would show people known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street because he sold his drugs from hotels, not his home. See Ex.-A, Declaration.

Seys argues the court denied his motion to withdraw his guilty plea founding no misconduct by the government failing to preserve the video footage. However, according to Milestone "when a camera records video or audio, all specified recordings are by default stored in the storage defined for the device. Each storage consists of a recording storage that save recordings in the recording database Recording. A storage has no default archive(s), but you can create these. To avoid that the recording database runs full, you can create additional storages. You can also create archives within each storage and start an archiving process to store data. Archiving is the automatic transfer of recordings from, for example, a camera's recording database to another location. In this way, the amount of recordings that you can store is not limited to the size of the recording database. With archiving you can also back up your recordings to another media." Id. See Ex.-B, Information obtained about Milestone Documentation/XProtect VMS products/XProtect VMS administrator manual/Storage and archiving.

21

The district court explained in denying the motion to withdraw his guilty plea that "there was no evidence Kearney intentionally destroyed files, consciously suppressed exculpatory evidence, or otherwise tried to circumvent disclosure requirements.". Id.

The court's failure to allow for the development of this claim was error. Seys was prejudice by counsel's failure to obtain Milestone information because Inv. Kearney supporting affidavit contained factual misrepresentation or omission relevant to the probable cause determination. Inv. Kearney stated in his search warrant affidavit that "if this case went to trial he would testify that certain persons known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street and Seys would frequently have black bags and/or brief cases in his possession when he left the house which was something he had observed on the Milestone video. If the videos, that still exist, does not show any of these things then this is a just and fair reason to withdraw Seys's guilty plea. If the video footage does not show "certain person known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street and Seys having black bags and/or brief cases in his possession when he left the house which was something Kearney alleges he had observed on the Milestone video," pursuant to Franks v. Delaware, 438 U.S. 154 (1978), a defendant may seek a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination. The evidence is material and the evidence still exist. Seys argues that the video evidence was never deleted, it is purposefully being withheld in violation of Brady. The video footage is being witheld

22

because it will show Inv. Kearney made misrepresentations to justify probable cause for the issuance of the search warrant that lead to the issuance of other search warrants. Instead of obtaining the requested Milestone camera information counsel told Seys that "if you don't plead guilty and go to trial if you're found guilty you will receive a life sentence," which induced the guilty plea. The video evidence will contradict the assertions by law enforcement as to what the video showed, which the government argued is consistent with methamphetamine distribution. The video will not show the visits and other claimed observations of the officers. The misstatements in the affidavits were material to the issuing magistrate judge's probable cause determinations, the court should remand for district court to conduct a Franks hearing to determine if the challenged evidence is available. Because Seys is in custody surrounded by similar camera system he is prohibited from obtaining the Milestone camera system information, and he could only obtain portions of the information through email. This issue has merit and Seys should be allowed to fully develop the claim.

      Ground Three: Whether counsel rendered constitutionally ineffective assistance for failing to challenge the government's failure to prove purity of 80% methamphetamine?

Seys argued his attorney was ineffective for failing to challenge the government's failure to prove purity of the methamphetamine above 80%. Seys asserted there was insufficient evidence to establish that he was trafficking in ice methamphetamine, which to qualify must be at least 80% pure.

The court premise "regardless of whether petitioner's attorney would have made more of an attack on the lack of testing of the

23

purity of the ice methamphetamine assessed against him by witnesses, the court would have found that it was more than 80% pure based on the purity of the same type of methamphetamine seized from him. Although it may have been possible that the purity level of the methamphetamine petitioner was distributing to others fell below 80% purity, it is highly unlikely given the purity of the methamphetamine seized from him. The government had to prove drug quantity by a preponderance of the evidence, and the court needed to only arrive at a reasonable conclusion as to the drug quantity. Under these standards, the court would have found petitioner responsible for the same drug quantity regardless of whether petitioner's attorney had made nuanced argument about the purity of the methamphetamine petitioner was distributing." Id. Order at 15.

Reasonable jurists could find the district court's assessment of this constitutional claim debatable or wrong. See United States v. Houston, 338 F.3d 876 (8th Cir. 2003), the appellant inmate sought review of his sentence rendered by the United States District Court for the Northern District of Iowa and argued that the district couer clearly erred in finding that he was accountable for more than 50 but less than 150 grams of actual methamphetamine... The quantity itself was supported, but the finding that it was actual methamphetamine was erroneous. The issue on appeal was whether the government proved that the methamphetamine quantities defendant admitted he helped manufacture were "actual" methamphetamine quantities, rather than mixture quantities. None of the methamphetamine manufactured was recovered and tested for purity. No expert testified as to the typical purity of methamphetamine manufactured in these

24

quantities, by this method, and in these conditions. The appellate court could only conclude that the district court simply assumed that the quantities defendant admitted to the government agent were actual methamphetamine quantities. The appellate court thought that this assumption was unwarranted. When a lay person is asked in general terms how much methamphetamine he helped someone else cook, his answer will almost certainly be in terms of the size of the resulting mixture, not the net weight of one of its components. The record was devoid of any evidence to justify a finding of at least 50 grams of actual methamphetamine, or 500 grams of a methamphetamine mixture, the minimum alternative quantities necessary to place defendant's offense in base offense level 32. The judgment of the district court was reversed and the case was remanded for resentencing on the existing sentencing record. See United States v. Carnell, 972 F.3d 932 (7th Cir. 2020)(holding the district court erred in finding that defendant sold d-meth amphetamine with a purity of 80% or more as described in USSG §2D1.1, cmt, application n. C, because the district court abused its discretion in finding the evidence reliable using the standards applied to evidence of drug for which the Guildeines did not require a particular level of purity; judgment reversed in part and affirmed in part, and case remanded.); see United States v. Moore, 2022 U.S. App. LEXIS 30831 (7th Cir. 2022)(holding defendant's claim that the district court erred by finding that the methamphetamine found in his home was 100% pure since a chemist's affidavit that he submitted was some evidence sufficient to call the purity finding into question was meritorious because the record showed the defendant provided more than a bare objection, he offered the opinion of an independent

25

expert about the reliability of the DEA's test result, and the defendant was not required to come forward with more specific and persuasive evidence contradicting the purity assertion in the Pre-sentence report (PSR), let alone conclusive contrary evidence, as the government suggested; moreover, the district court's assumption about the general reliability of DEA testing protocols was not supported by any evidence in the record; sentence vacated and case remanded.)

> Ground Five:  Whether in light of Bruen §922(g)(1) is
>                facially unconstitutional as applied to
>                Seys?

Seys argument that under Bruen he cannot legally prohibited as a felon to keep and bear arms.

The district court premise Seys's argument that his conviction for being a felon in possession of a firearm is unconstitutional in light of the Supreme Court's decision in New York State Rifle & Pistol Ass'n, Inc. v. Bruen is without merit. . . . The Court's own understanding of Bruen would show that it does not in any way invalidate the statutory bar against felons possessing firearms. Petitioner is not a law-abiding citizen, "and regulations governing non-law abiding citizens' use of firearms do not implicate Bruen." Order at 16-18.

Seys argues that his offense of conviction, being a felon in possession of a firearm, in violation of 18 U.S.C. §§922(g)(1), 924(a)(2) is unconstitutional, and he is actually innocence of the offense.  It violates his Second Amendment right based on the analysis the Supreme Court established in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S.Ct. 2111 (2022).  In step one, the text of the Second Amendment applies to the offense conduct.

Seys is among "the people," U.S. const. amend. II, as shown by
founding-era dictionary definitions of that phrase. His carrying
of firearms, both inside and outside the home, qualifies as "bearing"
arms based on District of Columbia v. Heller, 554 U.S. 570, 580-81
(2008), and Bruen, respectively. And the pistol he possessed
qualified as arms.

The government cannot satify its burden of showing a founding-era
tradition of firearms regulations distinctly similar to 18 U.S.C.
§922(g)(1). Congress did not bar felons from firearms possession
until the twentieth century, too late to inform the understanding
founders. Because the potential dangerousness of ex-felons is a
problem that the founders would not have been familiar with,
arguably analogous laws proscribing firearms possession by other
categories of people are not cimilar enough.

Seys's guilty plea did not waive his right to raise this
claim in a collataeral proceeding. This claim do not contradict
his admissions in pleading guilty.

Seys's conviction should be vacated because 18 U.S.C. §922(g)(1)
is unconstitutional based on the Second Amendment.

The Second Amendment reads "a well regulated Militia, being
necessary to the security of a free State, the right to keep and
bear Arms, shall not be infringed." U.S. const. amend. II. Congress
permanently barred felons from possessing firearms in 18 U.S.C.
§922(g), among other classes of "the people." This contravenes
the plain text of the Second Amendment and is inconsistent with the
founding-era tradition of firearms regulations.

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen,
142 S.Ct. 2111 (2022), the United States Supreme Court established

27

the proper analysis of claims that a law violates the Second Amendment. First, a court must consider whether the law proscribes conduct that the plain text of the Second Amendment protects. Id. at 2126. If the answer is yes, the law is presumptively unconstitutional, and the government bears the burden or demonstrating that the law is consistent with the tradition of firearms regulations around the time the Second Amendment was ratified. Id.

### A. The Plain Text of the Second Amendment covers the possession of firearms by felons.

"The People." A plain reading of the constitutional phrase "the people" does not purport to exclude felons. Founding-era dictionaries defined "people" to encompass the entire political community. See Thomas Dyche & William Pardeon, A New General English Dictionary (14th ed. 1771)("signifies every person, or the whole collection of inhabitants in a nation or kingdom."); Noah Webster, An American Dictionary of the English Language (1828) ("the body of persons who compose a community, town, city or nation.")

In District of Columbia v. Heller, 554 U.S. 570, 580-81 (2008), the Supreme Court entertained a "strong presumption" that this text refers "to all members of the political community, not an unspecified subset," which is the "unambiguous" meaning of the term in "all six other provisions of the constitution that mention 'the people.'" The court noted that the constitution uses "right of the people" in three places-- the First Amendment's assembly and petition clause, the Fourth Amendment's search and seizure clause, and the Second Amendment. Id. at 579. It concluded "the people" means the same thing in all three places-- the plain meaning of that term at the time it was adopted. Id. To hold that the Second Amendment

28

excludes convicted felons would thus lead to the absurd conclusion
that the First Amendment and Fourth Amendment also excludes felons.
Id. at 581.

The court and others agree.  In a different context, the
Eleventh Circuit stated that felons are "indisputably part of 'the
people.'"  United States v. Jimenez-Shilon, 34 F.4th 1042, 1046
(11th Cir. 2022)(finding bar on unlawful immigrants possessing
firearms does not violate Second Amendment because consistent with
history and traditions); see also United States v. Meza-Rodriguez,
798 F.3d 644, 672 (7th Cir. 2015)("we see no principled way to
carve out the Second Amendment and say that the unauthorized (or
maybe all noncitizens) are excluded.").

Although the Bruen court often referred to "law abiding"
citizens in its reasoning, this qualification was based on the
facts at bar.  See, e.g., Bruen, 142 S.Ct. at 2134.  It did not
purport to exclude non-law abiding citizens from "the people."

"To Keep and Bear."  Bruen, 142 S.Ct. at 2134, clarified that
"to keep and bear" arms includes carrying a firearm outside of the
home.  Heller, 554 U.S. at 635, confirmed it covered carrying
firearms inside the home.

"Arms."  "Arms include "waepons of offense or armour defense."
Heller, 554 U.S. at 581.  In particular, they include handguns, which
were in existence when the Second Amendment passed.  Id. at 629.

> B. Barring All Felons from Possessing Firearms
>    Is Inconsistent with the Relevant Historical
>    Tradition of Firearms Regulations.

Because the plain text of the Second Amendment contravenes
§922(g)(1), the government bears the burden of demonstrating that
§922(g)(1) is consistent with the historical tradition of firearms

29

regulations in this country.  To satisfy its burden, it is not enough to point to some generally analogous law.

"When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  Bruen, 142 S.Ct. at 2131. In contrast, "cases implicating unprecedent societal concerns or dramatic technological changes may require a more nuanced approach."  Bruen, 142 S.Ct. at 2132.  With such concerns, the "historical inquiry that courts must conduct will often involve reasoning by analogy," and "whether a historical regulation is a proper analogue... requires a determination of whether the two regulations are 'relevantly similar."  Id. (quoting C. Sustein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993).  When used in an adjectival phrase, "distinctly" means "in a way clear to the mind or perception; clearly, unmistakably, decidedly, indubitably." See Oxford Eng. Dict.

The potential dangerousness of felons is not a new problem unknown to the founders.  Benjamin Franklin wrote a satirical article proposing that the colonies send rattlesnakes to England in return for the thousands of convicts England was re-settling in the colonies.  See Bob Ruppert, "The Rattlesnake Tells The Story," Journal of the American Revolution (Jan. 2015).  Hence, a vague similarity or rough analogy between §922(g)(1) and some historical regulation of firearms is not similar enough to conclude that §922(g)(1) passess muster under the Second Amendment.  Prior laws barring firearms from different subsets of people-- whether by

30

reason of their purported virtuousness, religion, nationality, gender, slave status, landowner status, or allegiance, should not suffice to show a "distinct" similarity.

Section 922(g)(1) addresses specifically the subset of people labeled felons. This term, the class of people it denoted, and the risk-- perceived or real-- posed by persons in this class, all existed in 1791. The government must therefore show a specific historical tradition barring felons from possessing firearms.

The government will be unable to show this burden, since, as exhaustively researched by scholars and noted by a number of federal judges, including now-Justice Amy Coney Barrett, the historical record does not reveal any laws on the books proscribing the possession of firearms by felons until the 20th century. See Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019)(Barrett, J., dissenting) (after reviewing historical record concluding that no "historical practice supports legislative power to categorically disarm felons because of their status as felons."). Federally, Congress enacted the precursor to 18 U.S.C. §922(g) in 1938, which only applied to certain felons. United States v. Booker, 644 F.3d 12, 24 (1st Cir. 2011). It expanded the proscribed category to all felons in 1961. Id. And it changed the operative verb from "receive" to "possess" in 1968. Skoien, 614 F.3d at 640.

In Heller, 554 U.S. at 626, the court stated "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons...." But the District of Columbia law under consideration in Heller did not involve violations of 18 U.S.C. §§922(g)(1) and 924(a)(2) or the category of convicted felons, so this language was not necessary to its opinion. It's

31

statement was obvious dicta. "And dicta is not binding on anyone for any purpose." Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010).

Numerous District and Circuit Courts have treated this specific statement from Heller as dicta. See, e.g., Tyler v. Hillsdale Cnty. Sheriff's Dep't, 837 F.3d 678, 686-87 (6th Cir. 2015)(refusing to give "conclusive effect" to the Heller statement in determining whether §922(g)(4) was constitutional); United States v. Skoien, 614 F.3d 638, 639-40 (7th Cir. 2010)(describing language as "precautionary" and "not dispositive." United States v. Quiroz, 2022 WL 4352482 at *5 (W.D. Tex. Sept. 19, 2022)(Heller's endorsement of felon-in-possession laws was in dicta.").

Prior to Bruen, the Supreme Court "had not definitely resolved the standard for evaluating Second Amendment claims." Silvester v. Beccerra, 138 S.Ct. 945, 947 (2018). The courts of appeal "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine history with means-end scrutiny." Bruen, 142 S.Ct. at 2125. Step one asked whether the Second Amendment covered the conduct based on "the severity of the law's burden on that right." Id. (quoting Kanter, 919 F.3d at 441). The Supreme Court explicitly cited Georgia-Carry.org, 788 F.3d at 1260 n.34, as an example of a decision that prescribed this second step. Bruen, 142 S.Ct. at 2127, n.4. It then rejected the second step as "one step too many." Id. at 2127.

Bruen, explicitly set forth a new text-and-history standard for evaluating Second Amendment claims. As of this date, this court nor circuit has determined whether felons were part of "the people," nor analyzed the founding-era record of firearm regulations

32

asit relates to barring felons from possessing them.

Bruen did not involve §922(g)(1). But, a Supreme Court decision need not be directly on point to abrogate a lower court decision. The Eleventh Circuit in United States v. Archer, 531 F.3d at 1352 is a prime example. The Eleventh Circuit found that Begay v. United States, 553 U.S. 137 (2008) had abrogated United States v. Gilbert, 137 F.3d 1371 (11th Cir. 1998) by changing the standard for determining whether a predicate qualified as a USSU §4B1.2 crime of violence under the now repealed residual clause. Based on Begay, Archer found that carrying a concealed firearm was not a crime of violence, even though Gilbert had previously held the opposite and Begay involved a DUI predicate. Archer, 531 F.3d 1352. Likewise, Bruen did not involve §922(g)(1).

C. Seys Did Not Waive His Second Amendment
Claim by Pleading Guilty to Violating
18 U.S.C. §§922(g)(1) and 924(a)(1).

In Class v. United States, 138 S.Ct. 798, 802 (2018), the defendant pleaded guilty to violating 40 U.S.C. §5104(e)(1), which bars individuals from carrying firearms on the grounds of the Capitol Building. He pleaded guilty, and signed a plea agreement that specifically waived "several categories of rights," such as "all defenses based on the statute of limitations" and "the right to appeal a sentence at or below the judicially determined, maximum sentencing guideline range." Id. After his guilty pleam, he challenged the constitutionality of the statute on direct appeal, arguing, inter alia, that it violated the Second Amendemnt. Id. The district court and court of appeals each held his guilty plea waived the claim. Id. at 802-03. The Supreme Court reversed,

33

holding that "a guilty plea by itself" does not "bar a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." Id. at 803.

It reasoned that such a challenge neither "contradicts the admissions necessarily made upon entry of a voluntary plea of guilty, id. at 804, nor "focuses upon case related constitutional defects that 'occurred prior to the entry of the guilty plea'" and might "have been cured." Id. at 805 (quoting Blackledge v. Perry, 417 U.S. 21, 30 (1974). Rather, it "challenges the government's power to criminalize [his] (admitted) conduct." Id. at 805.

Seys makes the exact sort of claim that Mr. Class made. He argues that §922 violates the Second Amendment. That is, the Second Amendment deprives Congress of power to criminalize his possession of the firearms. This claim neither contradicts his admission in pleading guilty that he in fact possessed the firearms, nor does it relate to some defect specific to the criminal process in his case. Additionally, Seys's plea agreement did not waive challenges to the constitutionality of §922(g).

Because the Second Amendment encompasses Seys's charged conduct, the government cannot show §922(g)(1) is consistent with the founding-era tradition of firearm regulations, and Seys did not waive his right to raise this issue in a collateral proceeding.

## Conclusion

Due to the misstatements in Inv. Kearney's affidavit were material to the issuing magistrate judge's probable cause determination that lead to the issuance of additional search warrants and discovery of criminating evidence, the court should remand for a Franks hearing to determine whether the video evidence

34
Case 2:23-cv-01004-CJW-MAR   Document 5   Filed 06/16/23   Page 34 of 51

being held in Milestone storage archive or another recording
database location; the Third Circuit holding in Range v. Attorney
General, No. 21-2835 (3d Cir. 2023)(en banc)(holding 18 U.S.C.
§922(g)(1) violates Second Amendment; since Seys is proceeding
pro se, this court is charged with construing the petition
liberally in order to allow for the development of a potentially
meritorious case. See Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct.
173, 66 L.Ed.2d 163 (1980)(internal citations omitted). The court
should grant Seys's motion to reopen section 2255 and motion to
alter or amend judgment, pursuant to Federal Rules of Civil
Procedure 60(b)(1) and 59(e).


Dated: June 7th, 2023


                              Respectfully submitted,

                              Brandon James Seys
                              #17827-029
                              FCI Williamsburg
                              P.O. Box 340
                              Salters, SC 29590

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE

---

BRANDON JAMES SEYS,    )    No. 23-CV-1004 CJW-MAR
                 )        (19-CR-1004 CJW-MAR)
       Petitioner,  )
                 )
           vs.    )    DECLARATION OF MAILING
                 )
UNITED STATES OF AMERICA,  )
                 )
       Respondent.  )    The Hon. C.J. Williams,
                         United States District Judge

---

In accordance with the provision of Section 1746 of Title 28, United States Code, I, Brandon James Seys, do hereby make the following declaration:

On the 7th day of June, 2023, I hand-delivered to BOP officials at FCI Williamsburg my Motion to Reopen Section 2255 and Motion to Alter or Amend Judgment pursuant to Federal Rules of Civil Procedure 60(b)(1) and 59(e) for mailing to and filing with the court. See Houston v. Lack, 487 U.S. 266 (1988); United States v. Harrison, 469 F.3d 1216, 1217 (8th Cir. 2006) (under the prison-mailbox rule, a pro se prisoner's pleading is deemed filed at the moment of delivery to prison authorities for forwarding to the district court.)

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 7th day of June, 2023.

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

36

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE

BRANDON JAMES SEYS,           )     No. 23-CV-1004 CJW-MAR
                              )          (19-CR-1004 CJW-MAR)
            Petitioner,       )
                              )
              vs.             )
                              )
UNITED STATES OF AMERICA,     )
                              )
            Respondent.       )     The Hon. C.J. Williams
                                    United States District Judge

EXHIBITS   A - B

Exhibit - A

Declaration of Brandon James Seys

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE

| | | |
|---|---|---|
| BRANDON JAMES SEYS, | ) | No. 23-CV-1004 CJW-MAR |
| | ) | (19-CR-1004 CJW-MAR) |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | DECLARATION OF |
| | ) | BRANDON JAMES SEYS |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | The Hon. C.J. Williams, |
| | | United States District Judge |

In accordance with the provision of Section 1746 of Title 28, United StatesCode, I, Brandon James Seys, do hereby make the following declaration:

After my suppression hearing concluded but before I entered into a guilty plea I had conversation with attorney Michael Lahammer regarding Inv. Kearney's testimony during the suppression hearing concerning the Milestone camera system self-deleting. I I explained to counsel that the camera system had a storage system, called a "cloud" that saves all audio and video recordings in case of emergency or system failure. I told counsel that none of the video footage would show I had black bags and/or brief cases in my possession when I left the house nor would the video footage show people known to be involved with methamphetamine in the Dubuque area frequented 740 Boyer Street misstatement referred to in Kearney's search warrant application. The misstatements in the affidavit were material to the issuing magistrate judge's probable cause determination.

I was never informed by the court or counsel Lahammer that I could not appeal the court's denial of my suppression hearing if I entered into a guilty plea. Had I known that by entering a guilty I'll waive my right to appeal the court's suppression denial I would not have entered into a guilty plea.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 7th day of June, 2023.

Brandon James Seys
#17827-029
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

2

Exhibit - B

Milestone Systems

TRULINCS 17827029 - SEYS, BRANDON JAMES - Unit: WIL-F-B

---------------------------------------------------------------------------------

FROM: Middleton, Terry
TO: 17827029
SUBJECT: Milestone Systems
DATE: 06/05/2023 12:06:12 PM

Milestone has numerous systems but they need to know the type system to get more specific info.

Milestone Documentation / XProtect VMS products / XProtect VMS administrator manual / Storage and archiving (explained)
Storage and archiving (explained)
Available functionality depends on the system you are using. See the complete feature list, which is available on the product overview page on the Milestone website (https://www.milestonesys.com/solutions/platform/product-index/).

On the Storage tab, you can set up, manage and view storages for a selected recording server.

For recording storages and archives, the horizontal bar shows the current amount of free space. You can specify the behavior of the recording server in case recording storages become unavailable. This is mostly relevant if your system includes failover servers.

If you are using Evidence lock, there will be a vertical red line showing the space used for evidence locked footage.

Set up storage and archiving in XProtect Management Client.

When a camera records video or audio, all specified recordings are by default stored in the storage defined for the device. Each storage consists of a recording storage that saves recordings in the recording database Recording. A storage has no default archive(s), but you can create these.

To avoid that the recording database runs full, you can create additional storages (see Add a new storage). You can also create archives (see Create an archive within a storage) within each storage and start an archiving process to store data.

Archiving is the automatic transfer of recordings from, for example, a camera's recording database to another location. In this way, the amount of recordings that you can store is not limited to the size of the recording database. With archiving you can also back up your recordings to another media.

You configure storage and archiving on each recording server.

As long as you store archived recordings locally or on accessible network drives, you can use XProtect Smart Client to view them.

If a disk drive breaks and the recording storage becomes unavailable, the horizontal bar turns red. It is still possible to view live video in XProtect Smart Client, but recording and archiving stops until the disk drive is restored. If your system is configured with failover recording servers, you can specify the recording server to stop running, to let the failover servers take over (see Specify behavior when recording storage is unavailable).

The following mostly mentions cameras and video, but speakers, microphones, audio and sound also apply.

Milestone recommends that you use a dedicated hard disk drive for recording storages and archives to prevent low disk performance. When you format the hard disk, it is important to change its Allocation unit size setting from 4 to 64 kilobytes. This is to significantly improve recording performance of the hard disk. You can read more about allocating unit sizes and find help on the Microsoft website (https://support.microsoft.com/en-us/topic/default-cluster-size-for-ntfs-fat-and-exfat-9772e6f1-e31a-00d7-e18f-73169155af95).

The oldest data in a database is always auto-archived (or deleted if no next archive is defined) when less than 5GB of space is free. If less than 1GB space is free, data is deleted.. A database always requires 250MB of free space. If you reach this limit because data is not deleted fast enough, attempts to write to the database might fail and in that case no more data is written to the database until you free up enough space. The actual maximum size of your database becomes the amount of gigabytes that you specify, minus 5GB.

For FIPS 140-2 compliant systems, with exports and archived media databases from XProtect VMS versions prior to 2017 R1 that are encrypted with non FIPS-compliant cyphers, it is required to archive the data in a location where it can still be accessed

Case 2:23-cv-01004-CJW-MAR    Document 5    Filed 06/16/23    Page 42 of 51

---------------------------------------------------------------------------------------------

FROM: Middleton, Terry
TO: 17827029
SUBJECT: Milestone Product Index
DATE: 06/05/2023 12:06:12 PM

Milestone product index
Milestone video management software (VMS) products

Milestone Kite
Discover why Milestone Kite is the simple, secure and scalable cloud security option.

XProtect Essential+
Free entry-level software perfect for small single-site installations.

XProtect Express+
The perfect match for smaller, single site businesses that require full alarm management.

XProtect Professional+
Designed for mid-size installations that require central management of all servers, cameras and users.

XProtect Expert
Ideal for mid-size to large installations that require uninterrupted video recording.

XProtect Corporate
Designed for large-scale and high-security installations that require 24/7 operations.

-------------------------------------------------------------------------------------

FROM: Middleton, Terry
TO: 17827029
SUBJECT: Milestone Storage
DATE: 06/06/2023 11:36:12 AM

Brandon I am still searching for what you need but they have so much shit on their site I have to put in the exact parameters I am looking for.

Milestone Edge Storage
Feature Brief

Supporting camera-based edge storage
- enabling efficient and scalable video storage solutions

With edge storage support and Scalable Video Quality Recording  technology, Milestone unlocks the full potential of edge storage, by enabling an efficient hybrid storage solution that spans camera-based storage and central storage. This makes it possible to design a flexible, efficient and scalable storage solution that optimizes the use of network and storage resources, improving performance and reducing the overall system cost.
Edge storage refers to the capability to store video recordings inside, or close to, the actual camera capturing the video. The use of edge storage unlocks a number of possibilities to optimize recording server performance and the use of network and storage infrastructure in a video surveillance installation. Edge storage technology can also be used as an ingredient when designing redundant systems.
Edge storage as a redundancy option
The principal advantage of edge storage, when used in a redundancy solution, is its close proximity to the data source. This means that edge storage is an excellent redundancy complement to central server-based storage, because it is resilient against failures in physical cabling, networking equipment or in the central recording and storage environment.
As a redundancy option, edge storage is configured to continuously record video. In the event of a network problem, video continues to be recorded to the camera edge storage. Once the connection is reestablished, the central recording server automatically retrieves missing video.
Edge storage also serves as a complement in a failover recording server configuration, where edge storage can be used to bridge the short interruption in recording during the actual failover. In this case, the missing video can be retrieved from the edge storage, which gives 100 percent continuous and uninterrupted recording.
Key benefits
  Provide additional recording redundancy during system failures or maintenance downtime
  Leave recordings on the camera until they are needed
  Postpone retrieval of recordings to off-peak

hours to conserve network
bandwidth for other use
  Increase system reliability
over unstable connections
like wireless networks
  Supply a superior solution
for handling video data
recorded by mobile units
that go in and out of
network coverage
Key features
  Automatic retrieval of
edge recordings and audio
when camera connection
is restored
  Manual, event-driven or
scheduled retrieval of
video from edge storage
  Scalable Video Quality
Recording enables
retrieval of high-quality
video recordings as a
complement to existing
centrally stored video
Supporting camera-based edge storage
- enabling efficient and scalable video storage solutions

Optimizing network traffic
Using edge storage as the initial storage, and only storing
recordings in the central recording servers when needed,
significantly optimizes network traffic between the cameras
and the servers. Using manual, event-driven or time-
scheduled revival makes it possible to retrieve video from the
edge storage when and if needed.
Optimized network traffic is even more evident when cameras
are connected over slow or intermittent network connections,
which for example is the case when using vehicle-mounted or
body-worn cameras. In these situations video retrieval can be
postponed until the camera comes within high-speed network
coverage.
Scalable Video Quality Recording - SVQR
SVQR is a technology that fully explores the synergies
between edge and central server-based storage, resulting in
more efficient and cheaper video storage. SVQR makes it
possible to record high-quality video to edge storage, while a
low-quality reference video stream can be recorded centrally
in the recording servers. In the event of an incident or
investigation, the initial assessment can be made using the
centrally stored low-quality reference video, while the high-
quality video can be retrieved from the edge when and as
needed.
SVQR enables efficient video storage by seamlessly combining edge and
centrally stored video
SVQR significantly reduces the network traffic and central
storage costs because customers can store high-quality video
using edge storage and decide when to retrieve it. It's also a
cost efficient way of capturing high-quality, pre-event
recordings.
Supported Cameras

--------------------------------------------------------------------------------

See the supported camera section on Milestone website for details on which edge storage cameras are supported.

Feature availability

The capabilities described in this brief are available in XProtect Corporate, XProtect Expert and XProtect Professional+. For details please refer to the specification sheets of the individual products.

Want to know more?

Download the Edge Storage white paper.

Milestone Systems is a global industry leader in open platform IP video management software, founded in 1998 and now operating as a standalone company in the Canon Group. Milestone technology is easy to manage, reliable and proven in thousands of customer installations, providing flexible choices in network hardware and integrations with other systems. Sold through partners in more than 100 countries, Milestone solutions help organizations to manage risks, protect people and assets, optimize processes and reduce costs.

www.milestonesys.com

--------------------------------------------------------------------------------

FROM: Middleton, Terry
TO: 17827029
SUBJECT: More stuff
DATE: 06/06/2023 11:36:12 AM

Milestone Documentation / XProtect VMS products / XProtect VMS administrator manual / Archive structure (explained)
Archive structure (explained)
When you archive recordings, they are stored in a certain sub-directory structure within the archive.

During all regular use of your system, the sub-directory structure is completely transparent to the system's users, as they browse all recordings with the XProtect Smart Client regardless of whether the recordings are archived or not. Knowing the sub-directory structure is primarily interesting if you want to back up your archived recordings.

In each of the recording server's archive directories, the system automatically creates separate sub-directories. These sub-directories are named after the name of the device and the archive database.

Because you can store recordings from different cameras in the same archive, and since archiving for each camera is likely to be performed at regular intervals, further sub-directories are also automatically added.

These sub-directories each represent approximately an hour's worth of recordings. The one-hour split makes it possible to remove only relatively small parts of an archive's data if you reach the maximum allowed size of the archive.

The sub-directories are named after the device, followed by an indication of where the recordings came from (edge storage or via SMTP), plus the date and time of the most recent database record contained in the sub-directory.

Naming structure
...[Storage Path]\[Storage name]\[device-name] - plus date and time of most recent recording]\

If from edge storage:

...[Storage Path]\[Storage name]\[device-name] (Edge) - plus date and time of most recent recording]\

If from SMTP:

...[Storage Path]\[Storage name]\[device-name] (SMTP) - plus date and time of most recent recording]\

Real life example
...F:\OurArchive\Archive1\Camera 1 on Axis Q7404 Video Encoder(10.100.50.137) - 2011-10-05T11:23:47+02:00\

Sub-directories
Even further sub-directories are automatically added. The amount and nature of these sub-directories depend on the nature of the actual recordings. For example, several different sub-directories are added if the recordings are technically divided into sequences. This is often the case if you have used motion detection to trigger recordings.

Media: This folder contains the actual media that is either video or audio (not both)
MotionLevel: This folder contains motion level grids generated from the video data using our motion detection algorithm. This data allows the Smart Search feature in XProtect Smart Client to do very fast searches
Motion: In this folder, the system stores motion sequences. A motion sequence is a time slice for which motion has been detected in the video data. This information is, for example, used in the time line in XProtect Smart Client
Recording: In this folder, the system stores recording sequences. A recording sequence is a time slice for which there are coherent recordings of media data. This information is, for example, used to draw the time line in XProtect Smart Client
Signature: This folder holds the signatures generated for the media data (in the Media folder). With this information, you can verify that the media data has not been tampered with since it was recorded
If you want to back up your archives, you can target your backups if you know the basics of the sub-directory structure.

Examples of backup
To back up the content of an entire archive, back up the required archive directory and all of its content. For example, everything under:

--------------------------------------------------------------------------------

...F:\OurArchive\

To back up the recordings from a particular camera from a particular period of time, back up the contents of the relevant sub-directories only. For example, everything under:

...F:\OurArchive\Archive1\Camera 1 on Axis Q7404 Video Encoder(10.100.50.137) - 2011-10-05T11:23:47+02:00\

---------------------------------------------------------------------------------------------------

FROM: Middleton, Terry
TO: 17827029
SUBJECT: RE: Brandon Seys
DATE: 03/12/2023 02:36:12 PM

Milestone Documentation / XProtect Web Client / Configuration / Retention time and storage of recordings and investigations (explained)

The retention time of video recordings is a setting in XProtect Management Client that defines how long the recordings are stored in the system database. By default, the retention time period is seven days. If you want to change the retention time or the maximum database size, contact your system administrator. When the retention time expires, the recordings are deleted.

On the Views tab and the Investigations tab, you can play back video recordings not older than the number of days defined in the retention time settings.

If you want to prevent your recordings from being deleted, you must create an investigation on the Investigations tab. When you create this investigation, you can play back, export, and download the videos even if the recordings have been deleted from the system database.

In XProtect Management Client, the system administrator can also enable a setting for the investigation retention time that defines how long the investigations are stored on the mobile server. By default, the retention time period is seven days. When you enable this setting, all investigations that have been created before the retention time period are deleted.

To prevent your investigations from being deleted, you can prepare video exports and download the investigations on your computer.

BRANDON JAMES SEYS on 3/10/2023 7:51:09 PM wrote
Hey Terry, Getting back to you on the Milestone camera system. So I don't know what exact system they used but I need to know does this system Or can this system start self deleting files after the system reaches its retention period. There saying that happened in my case. I don't believe it nore do I have anything that would prove to me that happened. How would I get this question answered? Brandon

LEGAL MAIL
LEGAL MAIL
LEGAL MAIL

Brandon James Loys
#17827-029
Federal Correctional Institution
Williamsburg Medium
P.O. Box 340
Salters, SC 26590

Office of the Clerk
United States District Court
Northern District of Iowa
Eastern Dubuque
313 U.S. Courthouse
320 Sixth Street,
Sioux City, Iowa 51101

